WAL–MART STORES, INC., Plaintiff,

v.

Lewis R. CRIST, Receiver for Transit Casualty Company in Receivership, Defendant.

WAL–MART STORES, INC., Third-Party Plaintiff on Counterclaim,

v.

ALEXANDER & ALEXANDER, INC., Third-Party Defendant on Counterclaim.

Civ. No. 85–5036.

United States District Court, W.D. Arkansas, Fayetteville Division.

July 6, 1987.

**MEMORANDUM OPINION**

H. FRANKLIN WATERS, Chief Judge.

## I. The Litigation

This is exceptionally complex litigation between Wal-Mart Stores, Inc., one of the largest retail concerns in the country, and the Receiver of an insolvent insurance carrier, Transit Casualty Company, which wrote workers' compensation insurance covering Wal-Mart's employees in eighteen states in which Wal-Mart then had facilities.

The litigation started as a declaratory judgment action filed by Wal-Mart against Transit (prior to it being declared insolvent) seeking to enforce the provisions of an agreement that it says it entered into with Transit through one of Transit's agents, calling for Transit to provide workers' compensation coverage in those states for two separate policy periods, one commencing February 1, 1983, and ending January 31, 1984, and the second beginning February 1, 1984, and ending January 31, 1985. It is alleged that this agreement called for Wal-Mart to pay premiums not to exceed $3,500,000 for each policy year for such coverage.

Transit answered, substantially denying the allegations of the complaint, and alleging that the agreement which Wal-Mart seeks to enforce in this litigation is contrary to law and, thus, unenforceable. It counterclaimed, seeking to recover, in addition to the $7,000,000 in premiums already paid by Wal-Mart for the coverage, additional premiums approximating $20,000,-000.

In its reply to the counterclaim, Wal-Mart denied its allegations, and affirmatively pled that, in the event the agreement referred to is contrary to law, then Transit is barred from recovery on its counterclaim because it is *in pari delicto*. Subsequently, Wal-Mart amended its complaint to include allegations in relation to certain retroactive coverage that it says it contracted for which it claims Transit had, since the original complaint was filed, ceased performing the obligations required by such coverage. In addition, Wal-Mart brought

Stuart Cotton, Rein, Mound & Cotton, New York City, Robert Robinson, Hatfield, Robinson, Hodges, Marshall, Jordan & Shively, Little Rock, Ark., and Robert R. Rhoads, Asst. General Counsel, Bentonville, Ark., for Wal-Mart Stores, Inc.

W.H. Sutton and C. Tab Turner, Friday, Eldredge & Clark, Little Rock, Ark., for Lewis R. Crist.

Philip J. Walsh, Wilson, Elser, Edlman & Dicker, New York City, and Patrick J. Goss, Wright, Lindsey & Jennings, Little Rock, Ark., for Alexander & Alexander, Inc.

into the lawsuit, as a third-party defendant, Alexander & Alexander, Inc., (A & A) an insurance brokerage firm which it claims provided consulting services during the period relevant to this litigation. It seeks recovery from A & A of any amounts that it is required to pay to Wal-Mart.

Approximately sixteen months after the original complaint was filed, and after numerous amended pleadings and various motions were filed and disposed of, the Circuit Court of Cole County, Missouri, acting on a petition for liquidation of Transit filed by the Acting Director of the Division of Insurance, Department of Economic Development, State of Missouri, found Transit to be insolvent and appointed a Receiver for it. After a short stay of all litigation, this matter was allowed to proceed with Transit's interests being pursued by the Receiver, Lewis R. Crist, who was also at the time Director, Division of Insurance, Department of Economic Development, State of Missouri.

After substantial additional pretrial motions, including a motion for partial summary judgment, were filed and disposed of by the court, the matter was tried. Initially, a jury was selected at the request of one or more of the parties, and the case was tried to that jury for a period of approximately four and one-half days. At that time, all parties advised the court that they would waive a jury and would agree to have the matter tried and decided by the court. Whereupon, the jury was excused, and testimony was completed in two and one-half additional trial days.

The matter was taken under advisement so that the attorneys for the parties could file briefs in relation to the issues. The attorneys for the parties, all of whom performed admirably during the trial of this complex litigation, also favored the court with excellent post-trial briefs. In addition, an *amicus curiae* brief was filed in behalf of the Director of the Missouri Division of Insurance and was joined in and adopted by the State of Texas acting through its Attorney General. The court has considered the briefs, and after a careful consideration of the evidence received at the trial, is prepared to rule.

## II. The Facts

Transit Casualty Company was, at least when compared to other insurance carriers, a relatively small insurance carrier which, during the 1960s and 1970s, specialized in transportation related insurance, insuring primarily truck and bus operations. However, it had authority to write most types of insurance in most of the states.

By the late 1970s, because of changes in the transportation industry and increased competition from other carriers, Transit was "watch[ing] [itself] go out of business," according to Robert J. Olson, an officer with the company at the time. In approximately 1981 Transit's management decided to "get into the captive movement" and use captive insurance companies to reinsure Transit policies. In this manner, Transit hoped and intended to write insurance policies in lines of business in which it had not previously been involved and in which its employees had little if any experience. The officers of the company decided to proceed into those areas in that manner because, according to Olson, the idea was "that you don't have an insurance risk, you have a credit risk."

Because Transit had little if any experience in this area of insurance, its management decided that it needed to create a relationship with someone or some entity that did. Negotiations began with Donald F. Muldoon who had prior experience with the types of insurance that would be involved, particularly in "captive programs." These discussions resulted in the formation of a company known as Donald F. Muldoon & Co., Inc. (Muldoon), which was established in 1981 to "do fronting" for Transit. Transit retained a 24% ownership interest in Muldoon.

In January of 1982 Transit and Muldoon entered into a "Managing Agency Agreement" which substantially gave Muldoon the authority to issue any Transit policy which Transit was authorized to issue in any state in which it was qualified to issue insurance policies. The agreement con-

tained certain limitations which do not appear to be material to the issues in this case, except that the agreement provides that Muldoon had the authority to issue coverages on behalf of the company using "policies, contracts, certificates, utilizing rates and forms, endorsements and binders on behalf of the company which have been approved by the company and which have been approved by and/or conform with any applicable state insurance department laws and regulations." The agreement provided that Muldoon would "observe and comply with all insurance laws, rules and regulations of all states and the District of Columbia wherein any business is transacted for and on behalf of the company."

The Managing Agency Agreement authorized Muldoon to request, from time to time, that certain sub-agents be appointed with substantially the same authority as Muldoon in relation to the production and issuance of Transit insurance policies. Shortly after Muldoon was appointed Transit's managing agent, a former Alexander & Alexander, Inc., employee introduced Donald F. Muldoon to Carlos Miro, himself a former A & A employee. Mr. Muldoon recommended Miro, then doing business as Miro & Associates Risk Management, Inc. (Miro), to become a sub-agent of Transit. Miro was appointed a sub-agent and a "Managing Agency Agreement" (Wal-Mart Ex. 19) was entered into between Donald F. Muldoon & Co., Inc., and Miro & Associates, Inc. The agreement authorized Miro to

> solicit and bind only the types and lines of business as hereinafter stated, under the terms and conditions of this agreement, subject to and in accordance with the insurance laws and regulations of each state, and in accordance with rates, filings, forms, policy limits, underwriting guidelines governing acceptance of such business, and procedures, all as directed, filed and promulgated by the company from time to time; and to issue policies and certificates of such insurance on forms provided by the company, utilizing rates filed by the company pertaining to such coverages; and to amend such poli-

cies by endorsements authorized by the company; and to cancel such policies.

Muldoon provided Miro with blank policy forms to issue on Transit's behalf, and all of Miro's business was to be written or fronted on Transit policies and reinsured with Miro's captive reinsurers. For providing its insurance policies, name, filings, and, in effect, guaranty, Transit was to receive a fronting fee of 9% of the premium paid.

Under the agency agreement, Transit had the right to audit its agent's records and it recognized that there was a danger that the agent would exceed its authority. Accordingly, Transit had the right to cancel coverages if an audit revealed that an agent had exceeded its authority.

After Muldoon's appointment as Transit's managing agent, and Miro's appointment as a sub-agent, the Transit captive program grew very fast. According to Olson, in 1981 premiums from the program went from "zero to $40,000,000; and in 1982 it exceeded $100,000,000." By 1983, Miro was Muldoon's biggest premium producer. All of the policies issued by Miro on Transit paper were to be 100% reinsured. If the program had functioned as designed, there was minimal retained risk for Transit so long as reinsurance remained in place with solvent reinsurers.

Wal-Mart Stores, Inc., one of the largest retailers in the country, is headquartered in Bentonville, Arkansas. During 1980–1981 Wal-Mart was self-insured for its workers' compensation and general liability risks in all states in which it did business except the state of Texas and three or four southern states in which it had a limited number of employees. During that period of time it paid a monthly fee of $6,000 (later reduced to $3,000) to Alexander & Alexander, Inc., to act as its insurance consultant.

In April, 1980, John Sooter, an accounting graduate from the University of Arkansas in 1970, was appointed Wal-Mart's Director of Risk Management. Prior to that time, he had been an internal auditor for Wal-Mart and before joining Wal-Mart was an internal auditor for Standard Oil of Indiana (later Amoco Production Company)

and Pan-American Petroleum Corporation of Tulsa, Oklahoma. While Sooter, probably understandably, attempted to denigrate his ability and experience as a Risk Manager, the court believes that, at the time of his appointment to the Risk Management job, he was a sophisticated businessman and accountant. In addition, the court finds that he practically had at his beck and call, for $6,000 per month, the substantial insurance experience present within Alexander & Alexander. The evidence indicates that the individual from Alexander & Alexander who primarily consulted with him was George Hallinan, Vice President, a person with in depth experience in almost all phases of the insurance business for approximately thirty years.

In late 1982, Sooter asked Hallinan to obtain quotes for the Texas workers' compensation coverage which was up for renewal or replacement in a few months. In November of 1982 Hallinan brought to Sooter two quotes for the Texas coverage. One was from the Hartford Insurance Company and one was from Transit through Miro. Sooter was certainly sophisticated enough to recognize a "good deal" when he saw one. When he saw the quote on the Texas worker's compensation coverage, he immediately asked Hallinan to determine if Miro would be interested in bidding on the workers' compensation coverage for all states, replacing the self-insurance which Wal-Mart had in the other states. After being contacted by Hallinan, Miro indicated that he would gladly provide such quotes.

While it is not apparent from the evidence that Miro used much of the information to make the quote that he made, it appears from the evidence that he at least had access to Wal-Mart's payroll figures for the previous five years and also loss history for the self-insured states. This loss history was provided by a subsidiary of Alexander & Alexander, Alexsis, which had provided the adjusting services for Wal-Mart during the period that its workers' compensation coverage was self-insured.

In mid-January of 1982, Sooter, Hallinan and Pete Proffer, of Alexsis' St. Louis office where Wal-Mart's self-insured claims files were kept, attended a meeting in Miro's Dallas office. The meeting was also attended by two of Miro's employees who had also previously been employees of A & A.

It was obvious that Miro was the decision maker in the group. Certain testimony in relation to Miro is illuminating. When Sooter was asked if Miro was a "young man," he replied: "He appears to be a very young man. I don't believe he is quite as young as you would think he was if you saw him." Then later in his testimony he said: "He was just confident. He felt like he was intelligent and everybody around him thought he was intelligent and he was a very good speaker and just displayed a good bit of confidence." When he was asked if it was fair to say that he was "a pretty slick guy," he said, "I'd say he was pretty slick, yes.... Towards the end he had developed quite a staff and I don't know a number, but they started out with one little corner in an office building and they ended up with at least half of the floor of an office building."

At this Dallas meeting, and a subsequent one, Miro presented to Wal-Mart a quote which is set forth in Plaintiff's Exhibit 1. The court believes that the evidence shows, without question, that Miro proposed to write all of Wal-Mart's workers' compensation coverage in all of the states where it did business for a flat and guaranteed premium of $3,500,000. This premium, the court believes the evidence clearly shows, was not to be affected in any way by any factors other than an increase or decrease in Wal-Mart's payroll from the estimated figure of $547,000,000. The court believes that the evidence indicates that no one at either meeting, probably including Miro, really understood anything Miro said about how the $3.5 million premium was calculated, or the figures in Plaintiff's Exhibit 1, except for the bottom line figure. Everyone knew that he was bidding $3.5 million to provide the coverage, and that appears to be all that Sooter of Wal-Mart and his consultant, Hallinan, were interested in.

The testimony indicates that, apparently after arriving at the $3.5 million figure, Miro did some calculation on a Casio calculator and arrived at a "composite rate" of .63985 per $100 of payroll, determined simply by dividing $3,500,000 by $547,000,-000 and multiplying the quotient by 100. The court believes that the evidence indicates that the premium of $3.5 million was "pulled out of the air" and that the composite rate was a mere mathematical calculation which could have been made by anyone with a calculator and rudimentary knowledge about how to use it. The evidence does not indicate that the other figures and calculations shown in Plaintiff's Exhibit 1 had anything to do with the rate to be charged and the premium to be paid by Wal-Mart for this substantial insurance coverage. At least, no witness was able to explain to the court any other method for calculating the composite rate, and Plaintiff's Exhibit 1 appeared to be largely meaningless to the witnesses who testified, and is certainly meaningless to the court, even after several days of testimony. Unfortunately, Mr. Miro was no longer in the United States at the time of the trial, and did not testify.

During the Dallas meeting, either Miro was asked if he would be interested in bidding on what became known as the "tail coverage" or he volunteered to do so. In any event, Miro was asked to also cover, through Transit insurance policies, Wal-Mart's liability for workers' compensation benefits for the period from February 1, 1980, to January 31, 1983, when Wal-Mart was self-insured. In other words, Miro was asked to cover for a period of three years any Wal-Mart liability for workers' compensation benefits, whether they were known or unknown. In addition, he was asked to provide general liability coverage covering claims resulting from incidents which occurred from February 2, 1980, to October 15, 1981, again, whether they were known or unknown.

Miro agreed to provide this "tail coverage" for $2,852,000, the aggregate amount of "reserves" which Alexsis had established on incurred and reported claims (known claims). Apparently nothing was charged for incurred but not reported (unknown) claims. Miro said he could do that because he would invest the premiums in "Euro dollars." Although Alexsis, through Proffer, offered to make the claims files available, Miro indicated that he had worked with Alexsis during his tenure with A & A and that he was "familiar with Alexsis and had no problem with their reserves."

In short, the court is convinced that the evidence shows, whether right or wrong, that Miro, in behalf of Transit, agreed to provide workers' compensation insurance coverage for Wal-Mart's employees in all states for a guaranteed premium of $3,500,000, to be affected by absolutely nothing except increases or decreases in Wal-Mart's payroll. In the event of an increase or decrease, the premium would be adjusted using the "composite rate" of .63985, the figure calculated on his Casio. In addition, the "tail coverage" would be supplied for a guaranteed premium of $2,852,000, irrespective of what the losses turned out to be (and as will be indicated below, they turned out to be disastrous).

During the second meeting, Miro signed a binder using the figures in his proposal, gave it to Sooter, and they shook hands on the "deal." Thus, the court is convinced that the evidence indicates that Miro agreed to provide, and Wal-Mart quickly agreed to accept, a "deal" in which both the workers' compensation coverage and the tail coverage would be provided for a guaranteed premium of $6,352,000. It appears to the court that loss experience played little if any part in development of the premium, and the "deal" was that it would play no part in what Wal-Mart ultimately paid for its coverage. In other words, if its loss history was substantially greater than that of others in the industry (which turned out to be the case), Wal-Mart still would pay no more than the agreed amount for its coverage.

After the meeting in which the "deal" was made, Miro prepared and forwarded to A & A, Wal-Mart's consultant, the insurance policies received as Plaintiff's Exhibits 2 and 3. The workers' compensation

policy (Plaintiff's Ex. 2) was issued to Wal-Mart by Miro utilizing Transit policy forms on file with the appropriate state regulatory body. The policy contained a detailed provision for the computation of premiums based on state rates from National Council of Compensation Insurers (NCCI) manuals on file. This policy listed the sixteen states in which Wal-Mart at the time did business and purported to break Wal-Mart's payroll down into the various job classifications provided for in the NCCI manual on file with most states. The NCCI rate was applied to the purported payroll, by classification, and a total premium of $3,967,064 was calculated. Not surprisingly, sufficient discounts were applied on the declarations page to reduce the premium to exactly $3,500,000, the amount earlier agreed to. This workers' compensation policy also covered the tail coverage in relation to compensation benefits. In addition, the general liability policy (Plaintiff's Ex. 3) was prepared and issued providing the retroactive general liability coverage which Miro had agreed to provide.

These policies, after having been forwarded to A & A, were accepted by them and forwarded to Sooter at Wal-Mart. Sooter reviewed them and placed them in the book where he kept all policies.

As indicated above, the workers' compensation policy appears, on its face, to be a standard policy using manual rates, and appears regular on its face. In fact, the policy when issued contained an endorsement, signed by Paul Stanley, an officer for A & A, Wal-Mart's consultant, which provided that: "It is agreed that the premium for the policy is subject to an experience modifier not available at the time of policy issuance. Such experience modification, when determined, if different from the modification shown on the policy, will be stated in an endorsement issued to form a part of the policy." It should be noted that even though Sooter and officials of A & A contend that this was not part of the "deal" (and the court believes that it was not), this endorsement was signed by an officer of A & A and included in the policy which was subsequently forwarded to Sooter at Wal-Mart.

Sometime after the policy arrived, Sooter or one of his employees noted that, when the payroll figures shown in the policy and purportedly used to calculate the premium were added, the total was considerably less than the estimated payroll of $547,000,000. (The court believes the total of these figures is slightly in excess of $249,000,000.) When this was noted, Sooter contacted Hallinan at A & A and was told that "there was no problem." Hallinan told Sooter not to be concerned because it was "a really common practice" to depress payrolls to come up with an agreed upon premium. One of Miro's employees later confirmed that Miro had "backed into" the premium by depressing the payroll. In other words, it appears to the court that Hallinan knew at the time that what Miro had actually done was arrive at the bottom line and then plug into the formula provided for in the policy whatever figures were necessary to arrive at the bottom line. It is also obvious that Hallinan accepted this as being a "common practice" and told Sooter that there was nothing wrong with it. The policy as written was accepted by Sooter upon the recommendation of Hallinan, his $6,000 per month consultant.

As indicated, in contracting to provide the tail coverage Miro had "purchased" the Wal-Mart reserves and had covered all of Wal-Mart's liability for the prescribed time, whether known or unknown, for the total of the reserves that had been set up by the adjuster. As indicated, this proved to be disastrous. Approximately 185 new claims were reported to Wal-Mart after the "purchase" and Alexsis created approximately $666,000 in additional reserves for these new claims. In addition, there were adverse developments on several major cases including one in which a Wal-Mart customer had been hit above the eye while using an exercise machine in a Wal-Mart store. Alexsis had reserved that incident at $750 and Miro had "bought it" for that. It later resulted in a judgment of $135,000. A subrogation suit later recovered $88,000 which was paid into the registry of the court pending the outcome of this case.

Another case involved a "slip and fall" in front of a Wal-Mart store. It was initially reserved for $4,000, and was accepted by Miro at that figure, but later resulted in a $200,000 verdict.

When things began to "go bad" in relation to the tail coverage, Muldoon in behalf of Transit had an independent adjuster, Wendell Donahue, review the Alexsis files. He found many files in which a zero reserve was shown. He inspected 170 claims in which the reserve was over $5,000, and found that 103 of them were severely under reserved.

In late August of 1983, Sooter, Hallinan, Miro and one of Miro's employees met in Bentonville to discuss the possibility of providing Wal-Mart with a Transit general liability policy effective October 1, 1983. Miro was very interested and sent a written proposal offering general liability coverage. He also offered, as part of the package, to renew the workers' compensation coverage for a maximum premium of $3,500,000. Hallinan sent a letter to Sooter confirming Miro's renewal proposal for "the same guaranteed maximum premium." There were to be no other adjustments to this figure. Hallinan later confirmed in an October 14, 1983, letter to Miro Wal-Mart's "firm order" to renew the workers' compensation policy on the "same terms, conditions and premium as the current policy." In December of 1983, Sooter, Proffer and Hallinan met with Carlos Miro and some of his employees in Miro's Dallas office and Miro confirmed the renewal. Sooter was asked to prepare an estimated payroll for the renewal period. He first provided an estimate of $551,000,000, which he later revised to $630,000,000.

In January of 1984, Robin Page, one of Miro's employees, wrote to Hallinan suggesting that the workers' compensation premium for the second policy be increased to a little more than $4,000,000 for the coming year to reflect the increased payroll. Page wanted to apply the same "composite rate" of .6398 calculated by Miro at one of the early meetings as outlined above. When that "composite rate" was applied to the estimated payroll of $630,-000,000, it resulted in a premium of $4,031,-623.

Hallinan and Sooter discussed the proposal. They believed that Miro had already agreed to the same maximum premium, $3,500,000. This led to a June 12, 1984, meeting in Kansas City. Page, Hallinan and Sooter attended. By this time, Wal-Mart had calculated its actual 1983–84 payroll and reported a figure lower than the $547,000,000 estimate. This would result in a return premium to Wal-Mart of slightly in excess of $362,000. It turned out that Sooter's estimate of the 1983–84 payroll was much too low, but that was not discovered until several months later. In any event, based on what he apparently believed to be the lower total payroll, Sooter agreed to forego the return premium which he believed was due Wal-Mart if Miro would agree that the index figure or "composite rate" for the workers' compensation renewal be lowered to provide for a $3,500,-000 maximum premium based on the $630,-000,000 estimated payroll. The new "composite rate" would be .55555 per $100 of payroll which, not surprisingly, is the result when $3,500,000 is divided by $630,-000,000 and the quotient multiplied by 100. Again, it was that simple. Miro and Wal-Mart negotiated a guaranteed premium and the "composite rate" was changed as necessary to reflect it. The rate had nothing to do with Wal-Mart's loss experience which, by that time, everyone involved knew, or should have known, had been dismal. Miro prepared and forwarded to Hallinan the renewal policy (Plaintiff's Ex. 9) and Hallinan delivered it to Sooter. Again, it appears to be a standard workers' compensation policy listing the states in which Wal-Mart had employees, and reflecting standard NCCI rates. The purported payroll was broken down into job classification categories, and the rate for those categories applied. The premium purportedly developed through this method was reduced by sufficient discounts to arrive at the agreed $3,500,000 premium. Again, the policy called for an experience modifier endorsement to be attached. Although Sooter says that he did not add the payroll figures shown, it is clear, that by

this time, everyone concerned knew that those figures meant nothing other than they were the figures necessary to "back into" the agreed premium. In fact, the total of the payroll figures used in the policy appears to be $263,788,776 on a payroll that was estimated by Wal-Mart to total for the policy year $630,000,000. This policy was forwarded by Hallinan, with its obvious deficiencies and misstatements, to Sooter, apparently because Hallinan believes, according to his testimony, that such misstatements and untruths are common practice in the insurance industry. The policy was accepted by Hallinan and Sooter.

In July of 1984, shortly after the second policy was issued, Hallinan's assistant sent Sooter endorsements No. 9, 10, 11 and 12 for the second year policy, and endorsement No. 16 for the first year policy. Endorsements No. 9 and No. 16 contained experience modifiers prepared by NCCI showing how Wal-Mart's loss experience compared with like employers in similar industries. The endorsement for the first year policy showed an experience modifier of 1.70, and for the second year, 1.73. This means that, according to NCCI, Wal-Mart's loss experience was 70% and 73% greater than the industry average. This means, if the provisions of the policies are complied with, that the premium would have to be adjusted upward 70% for the first policy, and 73% for the second. Of course, it is Hallinan's and Wal-Mart's contention that the "deal" was that these experience modifiers would play no part in arriving at the premium to be paid by Wal-Mart. This is true even though they were sent to Wal-Mart by one of Hallinan's employees and included in the policies as the policies clearly provide that they should be.

During early 1984, apparently at Transit's request and demand, White & White Inspection Services, an independent auditing firm, was hired to audit the Wal-Mart payroll. In the fall of 1984, White & White concluded its audit and notified Miro of an increase in 1983 payroll from the purported $243,000,000 shown on the policy to $549,000,000. Miro applied this difference in payroll to the state rates on file in the various jurisdictions, applied the experience modifier received earlier from NCCI of 1.70, and after applying applicable discounts, reached an additional premium figure of $6,028,894.

Between September and December of 1984, three meetings were held among Wal-Mart, Miro and A & A personnel concerning payment of this additional premium. It appears that Miro advised Sooter and Hallinan that he knew that the additional $6,000,000 premium was not really owed since the policy had been sold for a guaranteed premium of $3,500,000, but that, in order to satisfy certain statutory requirements, and to satisfy Transit, it was going to be necessary for it to be billed and shown as paid. He suggested that the way that this could be done would be for his company to bill Wal-Mart and for Wal-Mart to then pay the bill by wire transferring $6,000,000 to Miro at the Dallas bank with which it did business. These funds would then be transferred to Lafayette Re, which was Miro's reinsurance company owned by him, domiciled either in the Cayman Islands or on the Isle of Man. Lafayette Re would then retransfer the $6,000,000 to Wal-Mart as a "dividend." He said that since all of the parties involved did business with the same Dallas bank, this could be done in one day. Surprisingly, and in fact astoundingly, Sooter of Wal-Mart, after consulting with another officer of Wal-Mart, agreed that "this would be no problem" if they could be assured that their funds would not be at risk. There is a great deal of testimony by both Sooter and Hallinan about this proposed transaction, but it is not at all clear from this testimony what they believe or wish the court to believe the purpose of this fake transfer was. Hallinan, for several pages of the transcript, testified that they only were told that the transfer was necessary to satisfy statutory requirements but they didn't know what those requirements were. Finally, in answer to the court's questions, after ducking and dodging for almost three transcript pages (pp. 6–160—6–162), Hallinan finally admitted that he saw no purpose for this illusory transfer other than to attempt to "fool

someone." He finally admitted that he knew of no one that Miro, he, and Sooter would have any reason to "fool" other than Transit and regulatory authorities.

Sooter's testimony on this subject is not substantially more enlightening. Although he agrees that he and his superior, also an officer of Wal-Mart, decided "that should we be given the proper assurances that the money would flow through as described back to us that it probably wouldn't present a problem," he professes not to know what the purpose of the sham $6,000,000 transfer was. The best that he could do was to say that they (Miro and Hallinan) told him that it was something that had to be done.

The fictitious transfer was not made because Miro's house of cards came tumbling down before it could be. Transit and Wal-Mart received word that Alexsis had not been reimbursed for claims paid by it in several weeks and was owed approximately $700,000. Transit subsequently cancelled Miro's authority and drew down the letter of credit that was established to guarantee the obligations of his reinsurance company. According to the testimony, the letter of credit was only $1.3 million.

In November-December of 1984, Transit learned that the reinsurers that had been paying claims under the Miro program had stopped making payments. On December 4, 1984, Miro's agency was terminated by Transit.

On January 2, 1985, Muldoon sent an invoice for $13,000,000 additional premium for the Wal-Mart coverage to Hallinan. Hallinan did not forward the bill to Wal-Mart, or even tell Wal-Mart personnel about it. Instead, he returned it to Muldoon, advising that it was not in compliance with the "deal."

In mid-January of 1985, Alexander & Alexander advised Sooter that there would be a meeting in the New York offices of Muldoon. At the meeting, George Bowie, Chairman of the Board of Transit, announced that Wal-Mart owed Transit an additional $13,000,000 in premiums and that additional amounts would probably be owed in the future. He produced the invoice earlier sent to Hallinan, with a copy of the letter to Hallinan attached and demanded that the bill be paid in two weeks.

Sooter of Wal-Mart, after overcoming the shock occasioned by the bill and the fact that Hallinan had not told him of the earlier billing, returned to Bentonville, Arkansas, to consult with other officers of Wal-Mart. Bowie was advised by Wal-Mart personnel that the senior officers that would be required to make the decision were not in the office, and they requested additional time to advise Bowie of their decision. However, rather than advise Bowie of their decision, Wal-Mart quickly filed this action in Arkansas in an obvious attempt to prevent suit from being filed against it in some other jurisdiction.

The Receiver claimed during the trial that total losses paid on the two workers' compensation policies and the tail coverage policy approximated $30,000,000, with approximately $21,000,000 of this being paid on the workers' compensation policies alone. Sooter testified (Tr. 2–68) that he believed this figure was too high, but admitted that payments on the policy were "somewhere in the neighborhood of sixteen to seventeen million dollars."

In respect to Sooter's sophistication in relation to insurance matters, he admitted (Tr. 2–70) that he had monitored the Texas self-insurance program for approximately three years. He recognized that that coverage required an audit and an adjustment of the premium based on the experience modifier. Wal-Mart had additional premiums to pay after the audits and application of the experience modifier, and he agreed that he saw such modifiers for each of the years on the Texas policy, but says that he had only a "vague understanding" of what an experience modifier was and how it applied. Then, with further cross-examination, it became obvious that he was fully aware of the purpose of these modifiers, and how they affected the premiums that Wal-Mart was required to pay on the Texas policy.

The court is particularly troubled by some of the testimony of Mr. Hallinan. Although, as indicated, he had over thirty

years of experience in the insurance industry and, at least during part of the period, was receiving $6,000 a month to consult with Wal-Mart, he professed to have an amazing lack of knowledge about insurance matters. In addition, the court had a distinct feeling that Mr. Hallinan's testimony was less than credible. To see why, one only needs to read his cross-examination at Tr. 6–49 through Tr. 6–56. It took over six pages of transcript to get him to finally admit that the purpose of depressing the payrolls as was done on both of the policies issued was to show regulatory authorities something that didn't exist. In other words, if the estimated payrolls of $547,000,000 on the first policy and $630,000,000 on the second policy were shown, it would be obvious to authorities with whom the policies had to be filed that the "deal" did not comply with requirements of law. After a great deal of sparring with the attorney examining him, the following question was asked and the following answer given:

> Q. All right. Now, Mr. Hallinan, isn't it a simple fact that since your testimony is that the way the rate structure is shown in the policy is not the way you're actually going to calculate policy premium has nothing to do with the way you're actually going to calculate the premium? That the only reason it was put in there with the wrong payroll is so that the state regulatory authorities would read it and say, well, that looks about right on a 3.5 million dollar premium?
>
> A. That's right.

Mr. Hallinan also testified that a "deal" for a $3.5 million premium on a payroll of $547,000,000 does not conform to state regulatory requirements, although it, again, took some "doing" to get him to say that. At Tr. 6–75 the following testimony is shown:

> Q. (By Mr. Sutton) Mr. Hallinan, you have referred to a contracted for maximum premium. And I don't know whether you claim that's what was done in this case or not; do you?
>
> A. Yes. There's an indication that a maximum premium would be available.
>
> Q. And did you tell us on your deposition that that kind of a proposal does not conform to state regulations on standard workmen's compensation policies?
>
> A. In this particular instance it is a different agreement.
>
> Q. It does not conform to state regulatory authorities, does it?
>
> A. Well, you're—it does conform to state regulatory requirements under the terms of the agreement.
>
> Q. Which one? The one that was filed with the state regulatory authorities?
>
> A. Well, yes.
>
> Q. But a contract for a flat 3.5 million dollar premium on a payroll of 532 or 547 or 549 million dollars—
>
> A. Right.
>
> Q. —does not conform to the state regulatory authorities, does it, sir?
>
> A. Not under that situation.
>
> THE COURT: I'm not understanding. What did you say? Not under that situation?
>
> THE WITNESS: Right.
>
> THE COURT: Are you saying it does or it doesn't. I don't know what that answer means.
>
> THE WITNESS: It doesn't.
>
> THE COURT: It doesn't. All right.

There is other testimony, coming from the mouths of Wal-Mart's consultants, that the "deal" was not filed with regulatory authorities but the sham policies with depressed payrolls were filed instead because those involved recognized that the "deal" would not be approved. At Tr. 6–163, Hallinan agreed that "you could not file in any state a 3.5 million dollar premium showing a $547,000,000 payroll." Paul F. Stanley, a vice president with Alexander & Alexander, with thirty-three years of insurance experience, the last twenty-two with Alexander & Alexander, was asked why "deals" such as the one in question in this case, were not filed with regulatory authorities. Al-

though he did not appear to want to answer the question during the trial, it was obvious during impeachment by counsel for Transit, that he had testified in a deposition as follows:

Q. Have you ever asked an underwriter why they don't put the agreement in the policy?

A. As I believe I stated earlier, my assumption would be that the agreement is not entirely according to the filings that they have in all the statements [sic].

(Based on additional passages that were read from the deposition, it appears obvious that "statements" should read "states.") Then, in answer to questions asked by the court, Mr. Stanley testified:

A. ... All right. In this case I'm convinced the evidence shows that the first premium, the premium for the first policy, the '83-'84 was—at least I think there's plenty of evidence to indicate that Mr. Miro at least agreed with Wal-Mart and with A & A that the premiums would be $3.5 million. They then, I suspect used the $547 million payroll, divided that into 3.5 and came up with .6398. At least it looks like that's what happened.

A. Right.

Q. It looks like .6398 had no relation to anything. Have you heard the testimony and had you looked at the file to see if that's a fact?

A. I've looked at the file. I don't recall the composite rate, but that's the way a composite rate of that sort would always be done, divide the premium by the estimated exposure.

Q. In other words, you do whatever you want to to arrive at what you think you can sell this policy for and then you—your composite rate is nothing more than the premium divided by the payroll.

A. That's correct.

Q. That's correct, and then in—or the next policy, '84-'85 I guess it would be, after a lot of negotiation the evidence shows having to do with

whether or not some returned premium was due Wal-Mart, they said okay, we'll let you have it for the same 3.5, and I guess not too surprisingly they've merely—and I've done that on my calculator—they merely divided 3.5 by $630 million and says oh, that's 555555 ratio and that's what the composite rating is going to be. Is that the way you understand this was done in this case?

A. Yes, sir.

Q. All right. Forgetting again about what's "right" and "wrong", do you believe that the filing of any state allows a premium—or the law of any state allows a premium to be arrived at in those kinds of ways? In other words, take any state—let's take Arkansas for example. If you told Arkansas that's the way we arrived at this rate by filing, what do you think would happen?

A. I don't think that would be satisfactory to the regulators in Arkansas.

Q. Would it be satisfactory based on your 30 some years of experience—would that be satisfactory anywhere?

A. No, I doubt that it would, sir.

Q. Every state requires that you charge a premium for the business you write in that state based on the statute and on the filings that are on file. Is that correct?

A. Yes, sir.

Q. All right.

A. Again, within whatever latitude your accepted filings in that state gives you.

Q. Sure, sure, sure.

A. Yes, sir.

Q. In other words, if the evidence shows that in Arkansas for '83 and '84 they had deviations or a deduction, I'm not sure which one it was, but a deviation of 25% on file, what you'd have to do in order to be legal in Arkansas is apply the man-

ual rates times the individual classifications of the payroll, apply the experience modifier to that and then deduct 25%.

A. That's correct.

Q. In other words, if you don't come up with a premium of at least that much you're not legal in Arkansas.

A. If you don't—yes, sir, that's correct.

Q. All right. The same kinds of things are done in all of the other states, or say at least similar things. You may have different filings as I understand it in other states, but the same kind of arithmetic has to be done in other states. Is that correct?

A. Yes, sir and as I understand the way it's done it's the composite of all those under the various filings that end up being—they are used to back into the premium that was quoted to the client. Obviously if the premium quoted to the client is lower than the composite of all those can be justified, then the insurance underwriter who did it has a problem, but I've never in my experience had an underwriter come back and tell me that was the case.

The testimony of Jan Taylor, an employee of the Arkansas Department of Insurance since 1979, was particularly helpful to the court. At the time of her testimony, Ms. Taylor was the Director of the Division of the Arkansas Department of Insurance responsible for reviewing contracts that property and casualty insurers issue in Arkansas, including workers' compensation insurance.

Among other things, Ms. Taylor described that workers' compensation insurance is social insurance and is regulated by the state of Arkansas, although controls had been reduced somewhat in recent years. However, it was her testimony that her department still had the responsibility of reviewing and approving or disapproving rate rule and form filings made by insurance carriers who desired to write insurance in Arkansas. She testified that Arkansas is a "prior approval state" which means that an insurance carrier must have prior approval of its rates and policies before issuing such policies in Arkansas. She testified that it was the department's duty to see that filings made and policies issued and rates agreed upon were not excessive, unfairly discriminatory, or inadequate. She said that the department had a duty to attempt to prevent carriers from treating one insured "different from another insured."

Ms. Taylor was asked: "What types of things have to be approved before they are used for workers' compensation in Arkansas?" Her answer was:

Every aspect of workers' compensation has to receive approval. Some of it can be done by the National Council on Compensation Insurance for their companies like coming up with a new job classification, but that does receive prior approval. The prices going to be charged to the insurer has to receive, we're talking about the front end price going out according to the risk, has to receive prior approval. Any sort of departure from anything previously on file has to receive approval.

She described that companies issuing policies in Arkansas could choose to adopt rates promulgated by the National Council on Compensation Insurance. She described the function of this Council as follows:

A. Because of the social nature of workers' compensation and because there are so many jobs performed by workers across the United States it's important for insurance companies who provide workers' compensation insurance to employers to have some kind of credible data so that they can use it as a point to determine how much they need to charge when they're going to issue policies to Dillards who has some clerical workers and has some retail salespersons, they have some drivers. All of these job classifications for across the United States are all reported together so if this is Class A–120 for instance, we'll have the experience of everybody that falls into that across the United States

from all the insurance companies writing that. They take that and they weigh each one for the various states, in other words we may have an awful lot of credibility, we have a lot of clerical workers in Arkansas. There are some classes that we have very little credibility for and an insurance company that wants to come in and write this in a state will need some idea how much they need to charge for that classification. The National Council collects the data and promulgates the rate that's going to be used for every job classification basically.

THE COURT: You say there's something over 600 jobs in the classes?

BY MR. TURNER:

Q. Now in Arkansas it's my understanding that they're not required to follow the National Council on Compensation, is that right?

A. Yes.

Q. Now if an insurance company desires to adopt what the National Council has promulgated as far as these national rates go, in other words if they want to use what the National Council has promulgated, how would they go about doing that in Arkansas?

A. They would generate a letter to the insurance department saying they're going to use the rates and rating plans on file by the National Council.

Q. Now let's go back to the years of 1983 and 1984. Are you familiar enough with filings that were in Defendant's Exhibit # 3 and could you tell the jury during that period of time whether Transit Casualty was a member of the NCCI in Arkansas.

A. Yes, they were a member of NCCI.

Q. Okay. Now once you become a member of the National Council in Arkansas, and you're writing workers' compensation insurance, and you want to modify this rate which is made by the National Council, you want to change it say from 110 to 115, can an agent for an insurance company or an insurance company just begin applying a different rate or must they first notify the Insurance Commissioner's office?

A. If they're going to use a member of NCCI and they have filed to use NCCI and they're not going to use $1.10 which is what NCCI had for that class code, they would have to file a request to use something other than $1.10.

Ms. Taylor testified that Transit had on file the deviations and scheduled rating plans introduced as Plaintiff's Exhibits 27, 28 and 29, with the effective dates shown, but that if any of these were to apply to a specific policy, it should be shown on the policy issued.

In answer to questions by Transit's counsel, Ms. Taylor said that she knew of no basis for writing workers' compensation insurance and calculating the premium other than on the basis of the expected payroll. The premium is calculated by breaking the estimated payroll down into the various job classifications, and then for NCCI companies, applying the rate for each job classification to the payroll for that category. To that is applied, at a subsequent time, the experience modifier developed by the NCCI. At Tr. 3–149, she testified:

Q. In those seven years, Ms. Taylor, have you ever had the opportunity or the occasion to run into a situation where a workers' compensation policy which is standard, has got the NCCI rates, it's got the appropriate payroll and it's got the experience modifier attached to it and endorsement and it's got everything that complies with what these statutory requirements are and that policy has been furnished to the insured but there's been some kind of side deal cut that alters the premium. Have you ever run into that?

A. I assume you mean a side deal—no.

Q. And that's not something that you would consider as being to the insurance department something that's common in the insurance industry, would you?

A. As far as we know?

Q. As far as you know.

**1256**

A. I would have to say no.

Q. In fact is a side deal—if the determined premium is different than what's been furnished to the insurance commissioner's office and the rates used are not on file, those are incorrect, are they not?

A. Using a rate other than that filed is incorrect.

She said that she had never seen a "composite rate" used in workers' compensation insurance. In respect to the "deal" which Miro made with Wal-Mart, she testified:

Q. Okay. Now, when we're talking about a composite rate we're talking about a rate for job classifications kind of like this rate right here for clerical, are we not?

A. I'm not sure what you're talking about in workers' compensation. I assume you are talking about combining all of the factors that go into it and using a composite rate.

Q. Okay. If you combined all of the factors for let's say clerical and I think you mentioned some number about in the different classifications there are but if you combined all of those average numbers, would that in some way reflect what it should reflect when you use them in the correct way by listing them separately? Do you understand my question?

A. No, I don't.

Q. Okay. I'm having a hard time. What I'm trying to say is if you use 100 classifications and 100 manual rates you come to some figure and then you used a composite rate and came to some figure, that messes up the whole procedure, does it not?

A. I don't think we would accept that.

Q. Okay. Now, let me show you a formula which has been called a rating formula as we've been discussing. On this blow up right here—can you see that from there? I can bring it closer.

A. It's alright.

Q. It says right here, earned premium equals chargable losses minus investment income over one minus six cost factor. Let me ask you if you have ever seen in your experience in the workers' comp. department down in Little Rock—have you ever seen a formula for workers' compensation rating anything like this?

A. No. Those things are used by the National Council to come up with the manual rate but their fixed cost factor—the earned premium of the losses, investment income, but not for developing a premium on an individual risk.

Q. If this formula right here, prior to either one of these policies being issued, if that formula had been submitted to your office to be approved on behalf of Wal-Mart—I mean on behalf of Transit Casualty for the Wal-Mart account, would it have been approved?

A. I don't think—I would say that we would have a lot of reservations, that we would probably spend quite a bit of time looking at it. It would not have been automatically approved, no.

Q. Out of the three standards that you described to us earlier today—

A. Uh-huh.

Q. —the unfairly discriminatory, inadequate and excessive, could you tell me what problems you would have with that formula right there?

A. I think you might have all three of them with that formula. Unfairly discriminatory because, you know, I assume it would be for one insured, and excessive because—do you want me to go ahead? Excessive because the—I can't really see it but I believe it has a fixed cost factor in the investment income. I'm not sure how you would pro rate that out for Transit Casualty when they're already included in the manual rates, the figures that are used by the National Council and could be inadequate, I don't know, it just depends

on what numbers they plugged there and how they segregated that account out.

The "proof" in relation to the amounts owed according to the policies of workers' compensation insurance as issued came from Frank R. Watkins who until June of 1986 was with Transit Casualty Company or its Receiver. When Transit was a solvent company, he was a Vice President in the Underwriting Department and, among other things, it was his duty to calculate premiums on workers' compensation policies. He prepared defendant's exhibit 40 which is a summary of his calculations showing the amounts that the Receiver claims Wal-Mart owes on the two policies. He says that he reviewed Transit's filings in all applicable jurisdictions and applied deviations on file. In fact, he testified that he applied the 15% deviation in Arkansas which was filed a few days before the initial policy was issued, even though it was not shown on that policy by Miro. In addition, he applied the relevant experience modifiers and discounts and computed the premiums shown on defendant's exhibit 40 using standard underwriting guidelines. Although Wal-Mart, through its attorneys, contends that these figures are not accurate, no evidence was offered by it to refute them.

Calculated in the manner described by Watkins, he testified that Wal-Mart owed an additional premium of $9,696,845 on the first policy, when the payroll determined by the White & White audit is used, and $7,505,378 if the payroll that Wal-Mart contends was the correct one is used. On the policy for the second year, he testified that the additional premium due is $9,266,766. Thus, according to these figures, Wal-Mart either owes an additional premium of $16,-772,144 if the Wal-Mart payroll figures are used for the first year and the White & White audit figures for the second, or $18,-963,611 if the White & White payroll audit figures are used for both years.

## III. Did Carlos Do It?

As indicated by the facts set forth in the preceding section, the evidence shows that Carlos Miro agreed with Wal-Mart to provide workers' compensation coverage for Wal-Mart in all of the states in which it did business for a flat and guaranteed premium of $3,500,000, to be affected by no other factors, for both of the years in question. It is also clear that, rather than show the "deal" entered into, undoubtedly, as will be discussed below, because it was obviously not in compliance with the law of any state, Miro prepared and forwarded to Hallinan for his review and acceptance standard worker's compensation insurance policies showing premium calculations which, if one was not aware of the depressed payroll shown, would comply with the laws of the states in which Wal-Mart had employees. Hallinan reviewed the policies, accepted them, and forwarded them on to John Sooter of Wal-Mart. This was done by Miro and accepted by Hallinan and, in fact, Sooter, even though none of the three believed for one moment that the policy correctly reflected the "deal." Hallinan apparently accepted it and sent it on to Wal-Mart because he believed that this was "common practice." In other words, his excuse was that "everybody does it."

 Prior to and during the trial, Transit contended that Wal-Mart was bound by the terms of the insurance policies delivered and accepted, and it objected on the basis of the parol evidence rule to any evidence being offered and received to show the "deal." At the start of the trial, the court ruled that the parol evidence rule did not apply, and, after hearing the evidence, the court is even more convinced that it does not. The court does not believe that anyone involved in the transactions or, in fact, anyone in the courtroom during the trial, really believes that the policies reflected the arrangement reached by the parties. The policies delivered were shams to show someone (and it must have been regulatory authorities) that policies had been issued which complied with the law of the states in which they had to be filed and reviewed.

Arkansas law permits parol evidence to show, among other things, that the written agreement is not really the agreement of the parties and what the parties in fact

intended their agreement to be. *See L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984); *Jefferson Square, Inc. v. Hart Shoes, Inc.*, 239 Ark. 129, 388 S.W.2d 902 (1965); *Kyser v. T.M. Bragg & Sons*, 228 Ark. 578, 309 S.W.2d 198 (1958). Parol evidence is always permitted where "there is a question of whether the parties intended to integrate their entire agreement into the document involved in the case." *Starling v. Valmac Industries, Inc.*, 589 F.2d 382, 386 (8th Cir.1979), *citing Farmers Coop. Ass'n v. Garrison*, 248 Ark. 948, 454 S.W.2d 644 (1976), *citing* 3 *Corbin on Contracts* § 573 (1960); *see also* 30 Am.Jur.2d *Evidence* § 1034 (1967).

In this respect, Transit contends that the "sham theory" which allows parol evidence to show that the writing is a "sham" is not applicable where parol evidence is offered to negate a legal contract and prove the terms of an illegal contract where the "real agreement" was made for the illegal or immoral purpose of deceiving or misleading public authorities or is contrary to public policy. *See Bank of America Nat. Trust & Sav. Assoc. v. Gillaizeau*, 593 F.Supp. 239 (S.D.N.Y.1984); *Bersani v. General Accident F. & L. Assur. Co.*, 36 N.Y.2d 457, 369 N.Y.S.2d 108, 330 N.E.2d 68 (N.Y. 1975); *Kergil v. Central Oregon Fir Supply Co.*, 213 Or. 186, 323 P.2d 947 (1958); 30 Am.Jur.2d *Evidence* § 1034 (Supp.1986). While this argument is not without merit, the court believes that that contention can be more logically and properly discussed in the section below which discusses the enforceability of the "deal." As indicated, the court believes that the evidence was admissible. The question of whether it should be considered by the court to prove an illegal or immoral contract or one against public policy is another question.

In short, the court is convinced that, in fact, Carlos Miro did exactly what Wal-Mart charges him with doing. He agreed to provide Wal-Mart's workers' compensation coverage for two years at a flat $3,500,000 per year, to be affected by nothing. In addition, he provided retroactive coverage, agreeing to pay any workers' compensation claims, whether known or unknown, arising in any of the Wal-Mart locations during the period from February 1, 1980, to January 31, 1983. He agreed to accept this liability, both known and unknown, for the amount of reserves set up by Wal-Mart's adjusters at the time the known claims were filed. In addition, he agreed to insure general liability claims at any Wal-Mart location, both known or unknown, which resulted from any incident occurring between February 1, 1980, and January 31, 1983.

Thus, the answer to the question posed at the beginning of this section, "Did Carlos Do It," is unquestionably "yes."

## IV. Did Carlos Have Authority To Do It?

There is no question but that Carlos Miro was an agent of Transit Casualty Company with the power to issue Transit policies. In fact, the evidence shows that he was provided by Muldoon, acting in Transit's behalf, blank pre-numbered policies to use for that purpose. An agreement was entered into between Miro and Muldoon acting in behalf of Transit. (Plaintiff's Ex. 19). Article I, subparagraph (a), specifically sets forth the actual authority granted by Transit to Miro. He was authorized to issue policies of insurance "subject to and in accordance with the insurance laws and regulations of each State, and in accordance with rates, filings, forms, policy limits, underwriting guidelines governing acceptance . . . all as directed, filed, and promulgated by the Company . . . utilizing rates filed by the Company."

The court believes that it is abundantly clear from the evidence in this case that Miro acted well outside the bounds of the actual authority granted to him. Unquestionably, he agreed to provide workers' compensation coverage which, in the court's view, as will be discussed below, is not in accordance with the insurance laws and regulations of any state in which Wal-Mart did business, and, the rates used clearly were not filed in any state and, in fact, could not be. Both of the officers of Wal-Mart's $6,000 per month consultant who testified, with combined experience in the insurance industry of over sixty years,

said that the "deal" could not have been filed and approved in any state of which they were aware.

Since Miro exceeded his actual authority, the question then becomes whether he had apparent authority to enter into the "deal." This court had occasion to consider the issue of apparent authority in *Scholtes v. Signal Delivery Service, Inc.*, 548 F.Supp. 487 (W.D.Ark.1982). In that case, we said that, in Arkansas, apparent authority is defined as follows:

> Apparent authority is such authority as a principal proclaims or permits, such authority which a principal by lack of care causes or allows, or such authority as a reasonably prudent man using diligence and discretion would naturally suppose. (citations omitted). The principal's liability attaches regardless whether the authority was actual or apparent, so long as the third party acts in good faith.

*Id.* at 495. *See also Arkansas Valley Feed Mills, Inc. v. Fox De Luxe Foods, Inc.*, 171 F.Supp. 145 (W.D.Ark.1959), *aff'd*, 273 F.2d 804 (8th Cir.1960); *Mack v. Scott*, 230 Ark. 510, 323 S.W.2d 929 (1959).

Thus, the law in Arkansas is that a showing of "apparent authority" requires both (1) conduct by the principal and (2) a reasonable belief by the third party dealing with the agent that the agent has the authority to do what he is doing. In this case, it is true that Transit made blank policies available to Miro and authorized him to issue them so long as he complied with the conditions set forth in the agreement discussed above. That is clear. The hard question is whether that conduct by Transit would cause a reasonable person to believe that Miro had authority to issue policies of workers' compensation insurance using a rate structure that even Wal-Mart's "experts" did not believe could be openly filed in any state.

It should be remembered that the insured in this case is Wal-Mart. We are not talking about a mom and pop five and dime on the corner of First and Main. Instead, we are talking about a company which, according to the authors of the popular book, *In Search of Excellence—Lessons from America's Best-Run Companies*, "is the mass retailing success story of the late 1970s and the early 1980s." T. Peters & R. Waterman, Jr., *In Search of Excellence— Lessons from America's Best-Run Companies*, 191–192 (1982). We are talking about a corporation that everyone in northwest Arkansas knows started as a small discount operation in northwest Arkansas and during the succeeding few years developed into one of the top three or four retailers in America. This is a corporation that almost anyone writing on modern day success stories includes in the story. It is considered, as evidenced by the discussion of Wal-Mart in the book cited above, to be one of the best-run businesses in all of this country and, in fact, there is rarely a discussion in books, magazines and newspapers about modern day business success stories that Wal-Mart and its founder, Sam Walton, are not given prominent and laudatory discussion.

Not only is Wal-Mart one of the best-run companies in America, the evidence in this case indicates that it had a whole department with a director that did nothing but look out after Wal-Mart's insurance interests. While Sooter, during the course of the trial, appeared to be attempting to convince the court that he knew little about insurance, the court does not believe for a moment that he was not a sophisticated and astute businessman knowledgeable in the area of insurance. If he was not, he would not have been Director of the Risk Management Division of Wal-Mart. Paul Stanley, Vice President of Wal-Mart's consulting firm, thought that he was. In a deposition given, a portion of which was read to him during the cross-examination of him at the trial, he said, "I would say in every case—we are dealing with rather sophisticated people such as Mr. Sooter and other risk managers and I can't get into their heads...."

The evidence in this case indicates that Sooter had been the Director of the Risk Management Department of Wal-Mart for almost two and one-half years at the time of the negotiation of the first contract. The evidence indicates that Wal-Mart, prior

to the Miro policy being issued, had been self-insured in most states and had a standard policy in the state of Texas. During the two and one-half years that Sooter had been the Director of Risk Management, he had monitored and been responsible for the proper operation of not only the self-insurance program but also the Texas program insured by a standard policy. He admitted, somewhat reluctantly, that he was aware of experience modifiers and how they were applied to calculate premiums. He was responsible for the self-insurance program so he must have been aware of Wal-Mart's loss history. The court simply does not believe that he really believed at the time that he entered into the "deal" with Miro that it was permissible and would be accepted in any state in which Wal-Mart did business. If he had believed that that was the case, why did he accept a policy of insurance that clearly did not set forth the agreement that he contends he reached? Why did he accept a policy that had depressed payrolls? Was it because Hallinan told him that that is "common practice" and not to worry about it? If that is the case, was that reasonable for a man of Sooter's business experience and expertise? The court believes that mom and pop on the corner would know that they should question a policy of insurance which doesn't even come close to properly setting forth the agreement that was reached in relation to the insurance coverage. As indicated, the "deal" was that the insurance would be provided for $3.5 million per year, not affected by anything. The policy that Sooter got and accepted clearly provided otherwise. It was clearly a standard policy, and it provided that the premiums would be calculated using the NCCI manual rates and would be adjusted by experience modifiers.

Sooter's testimony is that he made one deal but that he received and accepted something entirely different. Someone with much less business experience and business acumen than that displayed by Sooter should have worried about that even if his expert told him not to.

An event occurred during the second policy year which the court believes indicates that Sooter and the A & A people knew that the "deal" was not one that would, in the words of one of the A & A executives "pass muster" in any state. The court has reference to the $6,000,000 sham transfer that was agreed to and did not take place only because Miro's activities were discovered and the house of cards that he, Wal-Mart and Hallinan built came tumbling down before the transfer could take place.

Wal-Mart, in its brief, contends that this was a "non-event" and should have no bearing on the outcome of this case. The court disagrees. It is recognized that the transfer did not, for the reasons stated, take place, but the court is convinced that the fact that Wal-Mart's executives agreed to the transfer speaks volumes about their knowledge of whether the deal was a proper one insofar as state regulatory authorities were concerned. At Transit's insistence, Miro had the Wal-Mart account audited by White & White. The audit, when policy provisions were applied, showed that Wal-Mart owed an additional premium in excess of $6,000,000. Miro said to Hallinan and Sooter that he had a plan to get around this problem. His plan was that a sham transfer of $6,000,000 would take place. Miro would bill Wal-Mart for the additional premium and Wal-Mart would wire transfer $6,000,000 to Miro & Associates in Dallas which would then transfer the money to its reinsurance company which was domiciled either on Cayman Island or the Isle of Man. That reinsurance company would, the same day, transfer the funds back to Wal-Mart. Astoundingly, Sooter and his boss, an executive with Wal-Mart, agreed to this fake transfer and it is obvious that their only concern was that their funds not be "at risk."

The court believes that anyone reading the portion of Sooter's and Hallinan's testimony on this transfer would have to believe that they must have known more about the purpose of this than they now would like to admit. Their testimony is that Miro simply told them that it was to satisfy a "statutory requirement." They say that they did not know what that meant and they waited for Miro's lawyer to

tell them, but he never did. The court simply does not believe that. The court is convinced that astute and experienced businessmen of the caliber of John Sooter and George Hallinan must have known that this could have no other purpose than to "fool someone." In fact, under questioning by the court, Hallinan admitted as much. What other purpose could it have had? If Sooter and Hallinan really believed that the deal was a legal one, why the sham transfer? Could it have had any other purpose than to attempt to show someone that something occurred which didn't? Since the answer to that question is obvious, who could Sooter, Hallinan and Miro have been intending to "fool"? Could it have been anyone other than either Transit or state regulatory authorities? Hallinan agreed that it could not. The court can see no other explanation for this unexplainable conduct than that Sooter and Hallinan must have known that their "deal" did not comply with the law of any state and that that fact must be "covered up."

Even if it is assumed, for the sake of argument, that John Sooter did not know this, an assumption that stretches this court's credulity considerably past the breaking point, it is clear that the consultants which he paid, at least during part of the relevant period, $6,000.00 per month did. They said that they did. (Hallinan Tr. 6–163 and Stanley Tr. 7–128). It has long been the law in Arkansas that "the principal is affected with notice of all his agent knows in the line of his duty or the scope of his powers." *Whitehead v. Wells*, 29 Ark. 99 (1874), and other cases cited in West's *Arkansas Digest* Key No. 177(1). It is also well settled that a third person, by undertaking to deal with a purported agent, is put on inquiry as to the extent and scope of the agent's authority and must use due care to discover the authority or else suffer the consequences if it is exceeded. *See also International Harvester Co. v. McLaughlin*, 182 Ark. 1122, 34 S.W.2d 452 (1931); *J.T. Fargason Co. v. Dudley*, 173 Ark. 1148, 294 S.W. 6 (1927); *Hadley Milling Co. v. Kelly*, 117 Ark. 173, 174 S.W. 227 (1915); and 2A C.J.S. *Agency* § 168 (1972).

Applying the law, and considering what the court is convinced John Sooter knew and what the law imputes to him from Hallinan's and Stanley's knowledge, the court finds that it was not reasonable for him to believe, if he in fact did, that Miro had the authority to issue policies of insurance which would not comply with the filing requirements of any state. Thus, Miro did not have either actual or apparent authority to make the "deal" that he made with Wal-Mart.

The court is further convinced that John Sooter either knew or certainly should have known that he did not. The evidence, in the court's view, indicates that Sooter quickly recognized what a deal he was getting when he received the bid on the Texas only insurance. He promptly asked Hallinan to have Miro bid on all of their coverage. There is nothing wrong with that, but Sooter, like most of us, should have learned long ago that, whether it is a man in a pickup truck wanting to pave your driveway or roof your house, or someone on the telephone trying to sell you a lot in Florida, if the deal sounds "too good to be true," it probably is.

Did Carlos have authority to do it? The answer is "no" and it was not reasonable for Sooter and Hallinan to think that he did.

## V. Is The "Deal" Enforceable?

Workers' compensation insurance is social insurance not only required but also controlled by legislative enactments in every state. It has the salutary purpose of protecting employees, employers and the public by providing a means by which injured workers may be compensated during the period of their inability to work caused by the injury so that they may continue to exist and feed their families. The public is protected because, hopefully, this prevents injured workers from becoming wards of the state maintained at the expense of the public. Besides, it is the "right thing to do."

An overriding and compelling state interest has been recognized for many years

and is well expressed in *Employer's L.A. Corp. v. Success-Uncle Sam Cone Co.*, 124 Misc. 614, 208 N.Y.S. 510 (1925). That court said:

> It should be borne in mind that the policy of the state, as expressed in sections 67 and 141 of the Insurance Law, is to remove the matter of rates, premiums, and classifications from the field of private bargaining and agreement. Section 67 of the Insurance Law does this by providing that no rates shall take effect until approved by the superintendent of insurance, and thus limits the power of the insurance company and the insured to contract on the basis of one rate alone—the rate approved by the superintendent of insurance.
>
> This policy has a threefold purpose: First, to protect injured workmen and the dependents of those killed in industrial accidents, by insuring the financial stability of companies writing compensation insurance. This means the maintenance of adequate reserves on the basis of a sound and scientific system of rates carefully supervised by the state. Secondly, it has for its purpose the protection of employers against excessive rates, and it is the state's duty to afford this protection because employers for the most part are compelled by law to carry workmen's compensation insurance; they have no choice in the matter, except that certain large employers may under prescribed conditions carry their own insurance. And finally this policy was designed to guard against rebates, discriminations, and favoritism in rates, the effect of which would be harmful to employers as well as to injured workmen.

*Id.* 208 N.Y.S. at 512. *See also Public Service Mut. Ins. Co. v. Rosebon Realty Corp.*, 39 Misc.2d 663, 241 N.Y.S.2d 555 (1963).[1]

Although there is some dispute about what law applies in determining whether the insurance contracts in this case are enforceable, the court believes that the law in Arkansas on this subject is substantially similar to the law in each of the other states in which Wal-Mart did business during the relevant period. In addition, as already indicated, the court is convinced that the evidence shows that the "deal" entered into in this case would not be acceptable in any relevant state. Since that is true, it is not necessary for the court to determine whether the law of Arkansas or some other state applies. A choice-of-law analysis cannot begin until a specific issue has been found where laws conflict. *Snow v. Admiral Ins. Co.*, 612 F.Supp. 206, 208–10, (W.D.Ark.1985). Absent a real issue of conflicting laws, a court need not determine what "contacts" are relevant to a choice-of-law analysis. Acting otherwise would be responding to a "false conflict." *See generally* Restatement (Second) of Conflicts §§ 181–188 (1971).

Every relevant state requires that employers who meet certain criteria make provisions to protect their workers in the event of injury. Arkansas, nor any other state, gives the employers a choice about whether they desire such protection. They must have it. Likewise, the states do not give the employers a choice as to the amount of coverage that they will have. Instead, the law requires, not only that they provide such protection, but the level of protection that must exist. The law specifically sets forth the benefits that are payable in relation to injuries, and the employer may not choose to provide something different. For example, he cannot

1. *See also American Mut. Liability Ins. Co. v. Plywoods-Plastics Corp.*, 81 F.Supp. 157 (E.D.S.C. 1948); *Contractor's Safety Assoc. v. California Comp. Ins. Co.*, 48 Cal.2d 71, 307 P.2d 626 (1957); *Key System Transit Lines v. Pacific Employers Insurance Co.*, 52 Cal.2d 800, 345 P.2d 257 (1959); *Great American Ins. Co. v. Nova-Frost, Inc.*, 362 N.W.2d 358 (Minn.App.1985); *Employers' Liability Assur. Corp. v. Arthur Morgan Trucking Co.*, 236 Mo.App. 445, 156 S.W.2d 8 (1941); *Public Service Mutual Ins. Co. v. Rosebon Realty Corp.*, 39 Misc.2d 663, 241 N.Y.S.2d 555 (1963); *Warm Springs Forest Products Ind. v. Employee Benefits Ins. Co.*, 74 Or.App. 422, 703 P.2d 1008 (1985); *Mountain Fir Lbr. Co. v. Employee Benefits Ins. Co.*, 296 Or. 639, 679 P.2d 296 (1984); *Glenn H. McCarthy, Inc. v. Knox*, 186 S.W.2d 832 (Tex.Civ.App.1945); *Associated Employer's Lloyds v. Dillingham*, 262 S.W.2d 544 (Tex.Civ.App.1953).

say that he does not believe that his clerical workers, or some other class of workers, are not substantially at risk, so he won't make provisions to protect them. He must protect each worker at the level of protection required by the law of the applicable state.

█ Not only do the states provide that the employer must have such protection, every state, in one manner or another, provides what the employer will pay for it. In most instances at least, and the court believes in every state in which Wal-Mart did business during the relevant period, the amount that the employer pays for the insurance must be first approved in some manner by regulatory authorities. In other words, the employer is required by the state to carry insurance, and the state dictates the rates to be charged. It is true that, in recent years, more leeway has been granted in this respect, but the fact appears to be that every state relevant to the issues in this case still maintains substantial control over the making and charging of rates for workers' compensation insurance.

For example, in Arkansas, Ark.Stat.Ann. § 66–3120 (Repl.1980) requires all workers' compensation carriers to file rates, forms, rating plans and manuals with the Arkansas Insurance Commissioner's office for prior approval. The statute mandates that any rate or method of premium development for workers' compensation be on file with and approved by the Insurance Commissioner's office before it is offered. As Ms. Taylor testified, the purpose of this is to protect workmen and the public by ensuring that carriers do not unfairly discriminate between employers or charge excessive or inadequate rates. The court believes that it is obvious that this is a legitimate concern of the regulatory authorities.

Obviously, in order to protect the workmen and the public, the insurance provided must be "fair." It would not be "right" to allow an employer such as Wal-Mart, because of its immense size and bargaining power, to obtain insurance for an inadequate rate. Obviously, someone must pay under those circumstances, and it has to be either the public or other employers. The regulatory authorities are concerned that the rates be adequate because, if they are not, the insurance carrier providing the coverage often "goes broke" as Transit did, leaving someone else "holding the bag."

As indicated, Wal-Mart appears to contend that Arkansas law should not be applied to this matter in determining whether the "deal" is enforceable, but fails to say what law should be applied. In fact, all states listed in the insurance policies issued have similar legislation to that of Arkansas.[2]

In Arkansas, and it appears in the other states relevant to the issues, an employer may choose NCCI to establish the basic formula for determination of the premiums. According to Ms. Taylor, NCCI promulgates standard rates for over 600 job classifications. As Ms. Taylor explained, if an employer chooses to use NCCI rates, it must do so unless prior approval is obtained from the regulatory agency. If a policy is issued under these conditions, the premium to be charged is determined by breaking the estimated payroll down into the relevant job categories, and then applying by a simple mathematical calculation the NCCI rates to the estimated payroll for each category. If the employer is large enough, an experience modifier is later established by the NCCI to reflect each insured's actual experience in the various states. If the insured's experience modifier is greater than 1.00, the insured is required to pay additional premiums to cover its bad loss experience. The

**2.** Ala.Code § 27–13–29 (1975); Ark.Stat.Ann. § 66–3120 (Repl.1980); Fla.Stat.Ann. § 627.091 (West 1984); Ga.Code Ann. § 34–9–130 (1982); Ill.Ann.Stat. ch. 73, ¶ 1065.4 (1965); Ind.Code § 27–7–2–10 (Burns 1986); Iowa Code Ann. § 515A.6 (1949); Kan.Stat.Ann. § 40–1113 (1986); Ky.Rev.Stat.Ann. § 304.13–040 (1980); La.Rev.Stat.Ann. § 22–1407 (West 1978); Miss. Code Ann. § 83–3–107 (1972); Mo.Rev.Stat. § 287.320 (Supp.1986); Neb.Rev.Stat. § 44–1403 (1984); N.M.Stat.Ann. § 59A–17–10 (1978); N.C. Gen.Stat. § 58–124.20 (1982); Okla.Stat.Ann. tit. 36, § 901 *et seq.* (1976); S.C.Code Ann. § 38–43–330 (Law.Co-op 1984); Tenn.Code Ann. § 56–5–306 (Supp.1986); Tex.Ins.Code Ann. § 5.60 (Vernon 1981).

obvious intention of this is to encourage loss prevention techniques and to promote equality among insureds. Logically, if Wal-Mart's loss experience is 70% or 73% worse than the average, Wal-Mart should pay more. If it does not, someone does and obviously, in most cases at least, it has to be the employers who do a better job in containing losses than Wal-Mart does. Ultimately, of course, the public pays. This system insures that other employers and the public are not required to pay the "tab" because a particular employer is a sharper negotiator or has more bargaining power than others and is, thus, able to "beat down" the premium.

In Arkansas, and other states, the final step in premium development is a premium discount which is applicable if the premium developed is of sufficient amount. According to Ms. Taylor, these discounts are intended to provide credits to large insureds to recognize legitimate cost savings based upon lower per capita handling costs.

Employers who choose to use NCCI are also permitted, under proper circumstances, to take advantage of certain retrospective rating plans provided by NCCI. There are five retrospective rating plans provided, and they are based on the standard formula, but permit credits based on the insured's actual loss experience. The maximum premium is still calculated utilizing the standard formula, but it is reflected as a percentage of a standard premium. These plans still have requirements for maximums and minimums, and they utilize manual rates and experience modifiers and must be reflected in the policy and an applicable endorsement approved by the regulatory authority. They must be applied to legitimate estimated payrolls and cannot be manipulated, as was done in this case, to arrive at a premium already agreed to.

In recent years at least, Arkansas, and most other states, have relaxed the regulation of workers' compensation rates to some extent. In most states, an insurance company may deviate from the manual rates and rating plans by filing a proposed deviation or modified rating plan to be approved by the Insurance Commissioner's office. However, these plans cannot be discriminatory and the regulatory authorities in the states review them to ensure that they are not. Once approved, the deviation or modification can be utilized to develop premiums if it is reflected in the policy itself. According to Ms. Taylor, if such plans are not approved, the carrier is required to use the standard formula discussed above.

Ms. Taylor testified that, according to the department's records, Transit was a member of NCCI and had the plans or deviations introduced as Plaintiff's Exhibits 27, 28 and 29 on file with the effective dates shown. However, Ms. Taylor advised that if these deviations or plans were to be used, it should be shown on the policy. In this respect, the court believes that the evidence shows, unequivocally, that no one who had anything to do with developing the premiums in this case relied to any degree on these deviations or plans. It seems to be Wal-Mart's position that the insurer could have if it had wanted to, but the fact remains that it did not, and no one has any reason to believe that it did. The "deal" was that the premium would be $3.5 million, irrespective of any other factors.

It was Ms. Taylor's testimony, and it appears to be true in every other state, that after the initial premium is calculated as outlined above, the final premium to be paid by the insured is subject to adjustment by audit following the policy period. If the estimated payroll is less than the audited payroll, the insured pays additional premiums based on the applicable state rates, experience modifiers and discounts.

Arkansas has a statute which, in the court's view, makes it clear that a policy of insurance issued must reflect the true "deal" made between the insured and the insurance carrier. Ark.Stat.Ann. § 66–3019 has been called an anti-rebate statute, but in the court's view, it is much more than that. As indicated above, the court believes that, in Arkansas, and most other states, the legislature not only provides what coverage the employers of the state will have, but also what they must pay for it. This statute very effectively carries out

this legislative purpose. It provides in pertinent part:

(1) No property, casualty or surety insurer or any employee thereof, and no broker, agent, or solicitor shall pay, allow, or give or offer to pay, allow or give, directly or indirectly, as an inducement to insurance or after insurance has been effected, any rebate, discount, abatement, credit or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever not specified in the policy, except to the extent provided for in an applicable filing with the Commissioner as provided by law.

(2) No insured named in a policy, nor any employee of such insured, shall knowingly receive or accept, directly or indirectly, any such rebate, discount, abatement, credit or reduction of premium, or any such special favor or advantage or valuable consideration or inducement.

The court believes that this statute was intended to and clearly and unambiguously does provide what the insurer will charge for an insurance policy, and what the insured must pay for it. It leaves no alternative. It says that the insurance carrier must charge the premium shown on the policy and that the insured will not knowingly pay anything other than the premium shown unless there are applicable filings authorizing a premium other than that shown.

In this case, the policies in question showed a premium which, at least on its face, complied with state law. The fact is that we now know that it didn't because Miro depressed the payrolls and Sooter and Hallinan, although recognizing it, accepted it because it was "common practice." But the fact is that the policies, as issued and accepted, provide for the proper manner for calculating the premiums to be charged. These policies clearly and unambiguously say that it is recognized that the premiums shown on the face of the policies are estimated only, and that the final premium will be determined by an audit and an application of experience modifiers when available.

Thus, Ark.Stat.Ann. § 66–3019 directs Transit to charge the premium shown on the policies, and gives it no alternative but to do so. Similarly, this statute directs that Wal-Mart will not knowingly receive or accept any reduction in the premium shown on the policy unless there is a filing authorizing such reduction. For the reasons already stated, the court believes that Sooter was knowledgeable in insurance matters, and certainly his consultants were. The court does not believe that Wal-Mart, through its employees and consultants, can close their eyes and ears, as did the "three wise monkeys" in ancient Japan and say "we hear no evil, see no evil, and speak no evil." For the reasons already stated, the court is convinced that Wal-Mart and its consultants knew that this deal was too good to be true, and it cannot now say that it did not "knowingly" accept a reduction in premium that was not authorized by law.

Every state in which Wal-Mart had workers covered by the relevant policies has statutes similar to Ark.Stat.Ann. § 66–3019.[3]

In their briefs, the attorneys for the parties have very well set forth their views on whether the "deal" was legal or illegal and, if illegal, what should flow therefrom. Not surprisingly, Wal-Mart contends that, in the first place, the "deal" was legal, but if it was not, then the court should walk away from this matter, leaving the parties where it found them. On the other hand,

**3.** *See* Ala.Code § 27–12–14 (1975); Ariz.Rev. Stat.Ann. § 20–449 (1975); Fla.Stat.Ann. § 626.-9541(1)(n) (West Supp.1987); Ga.Code Ann. § 33–9–36 (1982); Ill.Ann.Stat. ch. 73, ¶ 763 (1965); Ind.Code Ann. § 27–1–20–30 (Burns 1986); Iowa Code Ann. § 507B.4 (Supp.1987); Kan.Stat.Ann. § 40–941 (1986); Ky.Rev.Stat. Ann. § 304.12–090 (1980); La.Rev.Stat.Ann. § 22–1214 (West 1978); Miss.Code Ann. § 83–3–121 (1972); Mo.Rev.Stat. § 379.356 (Supp.1986); Neb.Rev.Stat. § 44–361 (1984); N.M.Stat.Ann. § 59A–16–15 (1978); N.C.Gen.Stat. § 58–44.5 (1982); Okla.Stat.Ann. tit. 36, § 1204 (1976); S.C.Code Ann. § 38–55–130 (Law.Co-op 1984); Tenn.Code Ann. § 56–8–104(8) (1980); Tex.Ins. Code Ann. § 21.21 § 4(8) (Vernon 1981).

Transit contends that only the "deal" was illegal, and that it clearly was, but that the court should still enforce the policies as issued and require the premiums which are set forth in the policies to be paid.

The court believes that it is necessary that the premiums be paid, and it is not certain that it must get into the "thicket" which conflicting authorities have created in relation to illegal contracts. In our case, Wal-Mart received exactly the coverage required by Arkansas and apparently the other states. Thus, the coverage complied with the various statutes. The policies, as issued, said that specified rates would be paid for this insurance. The premiums so calculated would seem to comply with the law of Arkansas and every other relevant state and, unless criteria not present in this case are present, the law of those states requires that the premium set forth on the policy be paid. Thus, it would not appear to be necessary to determine whether the "side agreement" was legal or illegal. The law provides the coverage to be maintained and the price that is to be charged and paid for it. In view of this, the court believes that Wal-Mart is required to pay the premiums called for in the insurance policies issued. The law requires that.

Wal-Mart, during the trial, and in its briefs filed in its behalf by its attorneys, has indicated that that would not be "fair" because that is not what they contracted for. Yet, they have failed to show what they could have obtained the required insurance for from another provider, and this certainly should have been relevant, at least in relation to the third-party complaint which Wal-Mart filed against Alexander & Alexander. The court believes that it did not make this proof because there is none available which would indicate that any insurer anywhere in the country would have provided Wal-Mart with workers' compensation coverage which even came close to Miro's "deal." The court simply does not believe that any competent insurer would knowingly agree to provide Wal-Mart, or any other employer, with insurance covering employees in which there is a guaranteed cap on the premium to be charged. As in this case, this leaves the insurer in an unbelievably untenable position. Such an agreement could cause him to "go broke" as Transit did. In this case, the Receiver for Transit claims that over $21,000,000 in claims have been paid, and that before incurred but not reported claims have been identified and paid, they expect that total claim payments will exceed $30,000,000. Wal-Mart disagrees with this, but Sooter admitted during his testimony that he believes claims of 16 to 17 million dollars had been paid. It is certainly difficult to believe that any competent insurer would take on such an obligation, with no control over the results, nor would any reasonable employer believe that one would. It should be remembered that Transit, nor, in fact, Miro, A & A, or any other party except Wal-Mart, had nothing to do with the atrocious loss history that Wal-Mart had. That was something in the control of none of the participants other than Wal-Mart. What occurred is a perfect example of why the law of every state, and any reasonable insurer, requires that loss history have some effect on the premiums to be paid.

Thus, for these reasons, the court is convinced that the law of every state requires that Wal-Mart pay the insurance premiums called for in the policies of insurance issued, and it is not necessary to determine whether the side agreement, or the entire agreement, was legal or illegal.

■ Be that as it may, if it is necessary to make such a determination, the court is convinced, for the reasons already set forth, that the side agreement was unenforceable and void. *See American Mutual Liability Ins. Co. v. Plywoods-Plastics Corp.*, 81 F.Supp. 157 (E.D.S.C.1948); *Key System Transit Lines v. Pacific Employers Ins. Co.*, 52 Cal.2d 800, 345 P.2d 257 (1959); *Contractor's Safety Assoc. v. California Comp. Ins. Co.*, 48 Cal.2d 71, 307 P.2d 626 (1957); *Warm Springs Forest Products Ind. v. Employee Benefits Ins. Co.*, 74 Or.App. 422, 703 P.2d 1008 (1985), *aff'd*, 300 Or. 617, 716 P.2d 740 (1986); *Mountain Fir Lbr. Co. v. E.B.I. Co.*, 296 Or. 639, 679 P.2d 296 (1984); *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. 598, 195

S.W. 174 (Tenn.1917); *Associated Employers Lloyds v. Dillingham,* 262 S.W.2d 544 (Tex.Civ.App. 1953); *Glenn H. McCarthy, Inc. v. Knox,* 186 S.W.2d 832 (Tex.Civ.App. 1945).

In this respect, Wal-Mart earnestly contends in its briefs that the Arkansas case of *Pyramid Life Ins. Co. v. Patten,* 194 Ark. 987, 110 S.W.2d 526 (1937), is on point and represents not only the Arkansas rule, but the prevailing view. The court is convinced that a mere reading of that case shows that it is not, in fact, on point and is not, in fact, controlling to the least degree. The court was applying a 1937 statute that is not even similar in most respects to the one applicable to this case. At 194 Ark. 989, 110 S.W.2d 526, the court said:

> The statute, *supra,* does not appear to be aimed at those receiving life insurance policies, but rather against companies and their agents. It does not prohibit any person from receiving a rebate, and it does not declare any policy to be void where a rebate is given or accepted. It does prescribe the penalty for the violation of the law, and, under ordinary rules of construction, such penalty is exclusive. To give to the statute the effect contended for by appellant would be to enable it to take advantage of its own wrong.... Unless a statute prohibits the insured from receiving a rebate and denounces a penalty for its violation, it clearly appears that such statute is designed to regulate insurance companies and not to punish the public who deals with them. In the statute under consideration, no reference is made to the insured, no provision is made for avoiding the policy, and it is clearly not the legislative intent that violations of the rebate law do more than inflict the punishment named therein.

The statutory scheme discussed in the *Patten* case is clearly different from the plan now in existence in Arkansas. Now, as discussed above, the law of Arkansas provides how premiums are to be calculated and does not allow rates or formulas for rates to be used that have not received prior approval from the Insurance Commissioner. In addition, as the court in *Patten* pointed out, there was then no statute that

even, to the slightest degree, seemed to apply to the insured. That is no longer the case. Now, as discussed above, Arkansas law directs that no insurer knowingly receive any premium other than one properly approved and shown on the policy.

In fact, not only is the *Patten* case not on point, there is other Arkansas authority which holds that an agreement which violates an anti-rebate statute similar to the one now in existence in Arkansas is unenforceable. In *Schneider v. O'Neal,* 145 F.Supp. 120 (E.D.Ark.1956), *aff'd in part and rev'd in part,* 243 F.2d 914 (8th Cir. 1957), Judge Trimble held that an agreement to give a rebate to a car dealer on insurance provided to the dealer in violation of the Arkansas rebate statute then in existence, and similar to the present one, is unenforceable.

## VI. Doctrines of Waiver, Estoppel, and In Pari Delicto.

■ Wal-Mart contends that the Receiver should not recover because Transit has waived its right to do so, or is estopped from doing so. Based on the facts which the court believes exist in this case, as outlined in detail above, the court simply does not believe that the evidence supports the tests laid down for estoppel in cases such as *Askew Trust v. Hopkins,* 15 Ark. App. 19, 688 S.W.2d 316 (1985). In Arkansas, waiver is used interchangeably with estoppel, and for a waiver to be binding it must operate by way of estoppel. *Continental Ins. Co. v. Stanley,* 263 Ark. 638, 569 S.W.2d 653 (1978). The evidence simply does not support a finding that Transit or the Receiver knowingly waived any right granted to it by the insurance policies or is estopped from exercising those rights.

■ Wal-Mart also contends that the court should apply the doctrine of *pari delicto* and leave the parties where it finds them. According to this doctrine, in a case where the court finds that the parties are *in pari delicto,* it will not allow itself to be made the instrument of enforcing obligations arising out of an agreement which is illegal. *Wommack v. Maner,* 227 Ark.

786, 301 S.W.2d 438 (1957); 17 Am.Jur.2d *Contracts* § 216. The obvious purpose of the rule is to discourage illegal agreements and it extends to any agreement which is illegal, immoral, against public policy, or prohibited by statute. *Ganntt v. Ark. P. & L. Co.*, 189 Ark. 449, 74 S.W.2d 232 (1934); *Tate v. Gould*, 175 Ark. 306, 299 S.W. 24 (1927).

Because of the reasons for the rule, the court is convinced that it should not be applied in a case such as this one. To apply the rule in this case would not further the public interest and would not discourage illegal, immoral, and against public policy contracts. Instead, it would encourage them and allow Wal-Mart to walk away from this matter after having received 15 to 30 million dollars in benefits after paying premiums that are a fraction of that. As indicated, the "deal" which Wal-Mart received in this case was not in compliance with the law of any state, and Wal-Mart and its consultants didn't believe that it was. Why then should the court apply a rule that has salutary purposes in such a way as to fly directly in the face of the laudable reasons for the rule?

Other courts have held that estoppel, waiver, mistake or other affirmative defenses of that nature are not available in workers' compensation cases brought to recover premiums based on rates promulgated and on file with the applicable insurance department. *See Walker v. Bituminous Casualty Corp.*, 74 Ga.App. 517, 40 S.E.2d 228 (1946); *Travelers Indemnity Company v. Collier*, 205 Okl. 247, 237 P.2d 153 (Okla.1951); *Silver Threads, Inc. v. Insurance Company of North America*, 530 S.W.2d 874 (Tex.Civ.App.1975); *Associated Employers Lloyds v. Dillingham*, 262 S.W.2d 544 (Tex.Civ.App.1953); *Traders and General Ins. Co. v. Frozen Food Express*, 255 S.W.2d 378 (Tex.Civ.App.1953); *Brown and Root v. Traders and General Ins. Co.*, 135 S.W.2d 534 (Tex.Civ.App. 1939).

In any event, the court is convinced that this is not a case in which Transit is attempting to enforce an illegal agreement. Instead, Wal-Mart is. Wal-Mart brought this lawsuit asking the court to enforce the "side agreement." If it is not enforced by the court, Wal-Mart is bound by the policies issued and accepted which require payment of additional premiums. As indicated above, there is a line of cases that hold that the court should not allow or consider parol evidence to show what the "deal" was when its purpose was illegal or made to deceive and mislead public authorities. *See* cases cited at page 39 of this opinion. If Wal-Mart is permitted to avoid its obligation to pay workers' compensation premiums according to state rates for the very substantial benefits that it received, it has successfully enforced an illegal contract made to deceive public authorities and has frustrated the purpose of premium regulations.

On the other hand, Transit does not seek to enforce an illegal contract. Its counterclaim is based on the policies which were issued, delivered and accepted by Wal-Mart. The policies are standard workers' compensation policies with premiums based on estimated payrolls, state rates, and experience modifiers promulgated as contemplated by the law of each of the states in which the policies were to apply. The policy form was approved and on file with the Arkansas Insurance Department at least as early as 1980 and contained the standard formula used throughout the country to determine the premium to be charged. The policies are completely separate and independent from the "side agreement" and the Receiver requires no aid nor reference to such illegal agreement in calculating the additional premiums owed. Thus, requiring Wal-Mart to pay the premiums called for in the valid policy is not an enforcement of an illegal contract, and in doing so, the court is only doing what the law of Arkansas and every other relevant jurisdiction requires.

For these reasons, the court finds it unnecessary to discuss the very complicated area of the law relative to whether a trustee or receiver may be prevented from enforcing a contract provision because of the acts of the bankrupt prior to the insolvency.

## VII. Tail Coverage

█ The court has been asked by Transit to declare the tail coverage to be null and void because of misrepresentations made by and in behalf of Wal-Mart. The court finds that the evidence adduced at the trial simply does not support this. Unlike the workers' compensation insurance policies, the court can find no provision of law which does not permit that type of insurance. Apparently, the law allows anyone to insure about anything that they can find an insurance carrier to insure. If news media reports are accurate, that ranges from parts of a woman's anatomy to whether it will rain at a particular sporting event. The court can find no basis to hold that the tail coverage was not in compliance with law, and the evidence simply does not support a finding that Wal-Mart or its agents misrepresented the facts resulting in the incredibly bad deal that Miro made in behalf of Transit. Instead, the evidence is that the claims files in the Alexsis office were offered to Miro, but that he declined to consider them. Incredibly, he decided that, because he was familiar with Alexsis, he would accept reserves established by its employees and would charge nothing for incurred but not reported claims, apparently because he was going to invest the premiums received in "Euro Dollars," whatever that means.

In this respect, it is appropriate for the court to say that the evidence reflects that there is more than enough fault to go around in this case. Transit and its managing agent, Muldoon, were guilty of very ample malfeasances. They loosed this disaster (Miro) waiting to happen on the public and on themselves with almost no control of it. The court has not ruled as it has because it finds the employees of Transit or Muldoon blameless by any means. Instead, the court is convinced that, for the reasons discussed, the law and public policy demand that Wal-Mart pay an adequate premium for the insurance it received and that it not be allowed to use its tremendous influence and bargaining power to require other employers or other members of the public to pay millions of dollars for claims paid to its injured employees.

The court finds the tail coverage to have been properly issued within the actual or apparent authority of Miro, and that policy is enforceable according to its terms.

## VIII. Third Party Complaint Against Alexander & Alexander

█ Wal-Mart brought Alexander & Alexander into this lawsuit, asking that, in the event that judgment was rendered against it, Alexander & Alexander be ordered to reimburse it. The court finds, without question, that Wal-Mart's consultant did not serve it well. There is little question that Stanley and Hallinan, with a combined experience in the insurance business of over sixty years, should have known that this "deal" was too good to be true, and that it did not comply with the law of any jurisdiction. The court is convinced that, in fact, they did know that. For whatever reason, they did not, according to the evidence, advise Wal-Mart of this, and they are unquestionably derelict in their duties in not doing so.

After having said that, the court frankly doesn't know what it can do about it. What are Wal-Mart's damages? In the court's view, they were not proved at the trial. For the reasons indicated, the court is convinced that Wal-Mart is being required to pay for the coverage what the law requires it to pay. There was no evidence which indicates that, if Wal-Mart had been properly advised by Hallinan and Stanley, it could have gotten like coverage for some specified amount. As indicated, the court is overwhelmingly convinced that no other sane insurer would make the deal that Miro made. For this reason, there is no basis for the court to determine that Alexander & Alexander owes to Wal-Mart the difference between the premiums that it will be required to pay according to the policy, and the $3.5 million which Miro agreed to accept.

Likewise, there is no evidence from which the court could find that Wal-Mart could have received the same coverage for anything less than the amount that it is required to pay as a result of this lawsuit.

It is true that some of Wal-Mart's witnesses testified that they believed that deals calling for premiums less than the manual rates could have been obtained, but there was no evidence from which the court can find that that is true nor certainly any evidence which indicates, even if true, what that coverage would have cost.

Since this is true, there is absolutely no basis for this court to award a judgment in favor of Wal-Mart against A & A on any basis other than pure speculation. The law simply does not allow that.

## IX. Conclusion and Judgment

For the reasons set forth above, the court finds that Wal-Mart should be required to pay the premiums called for in the two workers' compensation policies of insurance discussed in detail above. Randy Watkins testified at the trial and submitted defendant's exhibit 40 as a summary of premium calculations which he made. The calculations, according to his testimony, were based on audits performed by White & White and John Sooter and rates contained in the 1983–84 NCCI manual. He reviewed Transit's filings for all applicable jurisdictions and applied appropriate deviations, experience modifiers and discounts, and computed the premium according to standard underwriting guidelines.

While Wal-Mart contends in its brief that his testimony was not adequate on damages, they failed to refute it during the trial to any degree, and did not offer evidence of their own. For this reason, the court believes that Mr. Watkins' testimony does correctly set forth the premiums that are due on the policies in question for the coverage provided.

Exhibit 40 contains two separate calculations for the premium for the policy year 1983–84. The reason for this undoubtedly was that, as the court recalls, while Wal-Mart's attorney did not object to the introduction of the first White & White audit, he contended that the payroll information was not correct. For this reason, Watkins also calculated the premiums for that year based upon what John Sooter said the payrolls were. There is a difference of in excess of $2,000,000 caused by this. However, because Wal-Mart's attorneys did not stipulate that the figures in the first audit were accurate, and because the White & White auditors were not called to testify, those figures, in the court's view, would be "hearsay." For this reason, the court will accept the premium determined on the basis of Sooter's estimate of the payroll for the first policy year.

This means that Wal-Mart owes total premiums for two years in the amount of $16,772,144.00. Such judgment will bear prejudgment interest from the date on which it was possible to calculate the premiums due. *See Bank of Mulberry v. Fireman's Fund Ins. Co.,* 720 F.2d 501 (8th Cir.1983), and cases cited in that decision.

Because the Receiver is in a better position than the court to determine on what date pre-judgment interest should commence, and because of the matter of certain funds being paid into the registry of the court, the court directs that Receiver's counsel prepare and forward to the court, within ten (10) days of the receipt of this opinion, a judgment in compliance with the court's decision. In respect to the pre-judgment interest issue, the court directs that the Receiver cite the court to the evidence in the record which establishes the date on which such interest should commence.