**WAL–MART STORES, INC., Appellant,**

v.

**Lewis R. CRIST, Appellee.**

**WAL–MART STORES, INC., Appellant,**

v.

**ALEXANDER & ALEXANDER, Appellee.**

No. 87–2212.

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1988.

Decided Aug. 26, 1988.

Rehearing and Rehearing En Banc Denied Nov. 18, 1988.

David A. Ranheim, Minneapolis, Minn., for appellant.

William H. Sutton, Little Rock, Ark. and Philip J. Walsh, New York City, for appellee.

Before WOLLMAN and BEAM, Circuit Judges, and RE,* Chief Judge.

BEAM, Circuit Judge.

Wal–Mart Stores, Inc. (Wal–Mart) appeals from a decision of the district court ordering it to pay $19,946,038.20 in premiums and interest to the receiver of an insolvent insurance carrier, Transit Casualty Company (Transit), which carrier issued policies of workers' compensation insurance covering Wal–Mart employees in the states in which Wal–Mart conducted business. Wal–Mart contends that the district court drew erroneous legal conclusions from certain undisputed facts presented over seven days of trial. We agree and reverse.

BACKGROUND

The facts of this case are lengthy and complex. The district court issued an opinion which sets forth the numerous transactions giving rise to this litigation, see *Wal–Mart Stores, Inc. v. Crist,* 664 F.Supp. 1242 (W.D.Ark. 1987), and we will not attempt to restate each of the district court's findings here. We will, however, discuss those facts essential to an understanding of the issues presented on appeal and to our resolution of those issues.

Wal–Mart owns and operates a very successful chain of retail stores, with facilities in eighteen states at the times relevant to this appeal. In each of these states, as required by law, Wal–Mart provided workers' compensation insurance for its employees. Beginning in 1980, Wal–Mart became self-insured for its workers' compensation obligations and for its general liability risks in all states in which it conducted business except Texas and a few southern states in which it maintained only a limited number of employees. Wal–Mart remained self-insured through late 1982, at which time John Sooter, Wal–Mart's Director of Risk Management, sought proposals for renewal or replacement of the workers' compensation policy covering Wal–Mart's Texas employees. Offers were solicited through Wal–Mart's insurance consultant, Alexander & Alexander (A & A). One of the quotes which A & A presented to Wal–Mart was from Transit through its agent Carlos Miro.

Carlos Miro owned and operated Miro & Associates, an underwriting agency in Dallas, Texas. In May of 1982, Miro entered into a "Managing Agency Agreement" with Donald F. Muldoon & Co., Inc. (Muldoon), a Transit general agent who possessed authority to appoint sub-agents. This agreement authorized Miro to issue and place insurance coverage on Transit's behalf. Miro was provided with blank Transit policy forms for this purpose, and quickly became Transit's most productive agent.

The quote which Miro provided for Wal–Mart's Texas workers' compensation coverage, utilizing Transit policy forms, was quite favorable. Upon receipt of the Texas proposal, Wal–Mart asked Miro to provide a quote for workers' compensation coverage for all Wal–Mart employees to replace the self-insurance arrangement utilized by

* The HONORABLE EDWARD D. RE, Chief Judge, United States Court of International Trade, sitting by designation.

Wal–Mart in the other states. Miro gladly accepted Wal–Mart's invitation, obtained and reviewed Wal–Mart's payroll data and loss history for several prior years, and arranged a meeting in Dallas to present his proposal.

Miro offered to provide workers' compensation insurance coverage for all Wal–Mart employees for a flat and guaranteed premium of $3,500.000.00. The premium was to be unaffected by any factor other than an increase or decrease in Wal–Mart's estimated annual payroll, a change in which would increase or decrease the premium proportionately. The district court found, though Miro did consider Wal–Mart's loss history in reaching the $3.5 million figure, that Miro quoted the premium as a guaranteed flat rate, not to be adjusted or influenced by the amount of claims paid.[1] This arrangement was very attractive to Wal–Mart, according to Sooter, not only because of the competitive price, but because Wal–Mart could budget in advance for a fixed maximum premium expense. Wal–Mart accepted Miro's bid, and received a cover note and binder from Miro which set forth the terms of the agreement.[2]

Somewhere between thirty and sixty days after the coverage took effect, Miro sent A & A the Transit policy which purportedly embodied the agreement. A & A reviewed the policy, considered it satisfactory, and sent it to Wal–Mart who also reviewed its terms. The policy contained a provision for computation of premium in accordance with standard manual rates promulgated by the National Council of Compensation Insurers, which rates were on file with the appropriate state regulatory bodies. The various rates were multiplied by estimated payroll for each job classification to reach an aggregate premium. The policy was structured so that the premium obtained after multiplication of rates times payroll, less discounts, was exactly $3,500,000.00, as agreed upon. However, to reach this result, Wal–Mart's estimated payroll, reported by Transit to be $547,000,-000.00, was reduced on the face of the policy to approximately $250,000,000.00. If the actual payroll estimate had been used, the total premium due would have been well in excess of the agreed upon figure. Wal–Mart and A & A were both aware that the estimated payroll had been depressed, but took no action and accepted the policies. In fact, A & A advised Wal–Mart that this was a common practice in the insurance industry and that it should be of no concern. Additionally, certain endorsements were attached to the policy which, if enforced, would have operated to raise the premium if losses proved greater than expected. Wal–Mart and A & A were also aware of these provisions, but apparently assumed they would not be enforced, since to do so would violate the premium portion of the agreement. A similar policy was issued for the following year, for the same $3.5 million maximum premium. Payroll figures utilized in the renewal policy were also substantially depressed.

Near the end of the second policy year, problems began to surface. Claims on the Wal–Mart policies turned out to be well beyond any of the parties expectations, and far in excess of premiums collected on the policies. Transit asserts that amounts paid to date on the two policies approximate $21,000,000.00. It is not surprising, therefore, that Transit soon learned that Miro's

---

**1.** Miro's proposal did include a formula, which would have adjusted the premium downward if Wal–Mart were to have an extremely favorable loss experience. However, the district court found, and we agree, that even with this potential adjustment, the parties all understood the principal element of the proposal to be a maximum guaranteed premium which would not be increased if losses became substantial.

**2.** Miro also agreed to provide coverage for Wal–Mart's future liability for workers' compensation benefits for the period from February 1, 1980 through January 31, 1983, when Wal–Mart was self-insured. This coverage was provided for just under $3 million, the amount of reserves which had been established by Wal–Mart on claims incurred and reported during this period. With respect to this agreement, involving "tail coverage" as the district court described it, the district court found that Miro and wal–Mart had entered into a fully enforceable agreement which was binding upon both parties. This portion of the district court's decision is not challenged on appeal, and we shall not discuss it further.

captive reinsurers, with whom the entire risk on the Wal–Mart policies had been reinsured, had stopped paying claims.[3] Shortly thereafter, Miro's agency with Transit was terminated, and Transit demanded additional premium payments from Wal–Mart in accordance with the rates set forth in the issued policies and Wal–Mart's actual payroll.

Upon receipt of Transit's demand for additional premium, Wal–Mart filed this suit for a declaratory judgment seeking enforcement of the agreement entered into with Miro. Transit answered, alleging that the agreement which Wal–Mart seeks to enforce is contrary to law and unenforceable. Transit also counterclaimed for nearly $20,000,000.00 in additional premiums it claims Wal–Mart owes pursuant to the terms of the two policies. Wal–Mart denied liability on the counterclaim, and filed a third-party claim against A & A, seeking recovery of any amounts which Wal–Mart is required to pay to Transit. After making thorough and detailed factual findings, the district court concluded (1) that Miro exceeded his authority, both actual and apparent, in entering into the agreement with Wal–Mart; (2) that the premium provisions of the agreement are illegal and unenforceable under state insurance law; and (3) that Wal–Mart is bound by the terms which were actually embodied in the Transit policies, though those terms differ substantially from the actual agreement which had been reached. The court ordered Wal–Mart to pay additional premiums to Transit, in accordance with the manual rates set forth in the policies and with Wal–Mart's actual payroll figures. Wal–Mart appeals each of these determinations.

## DISCUSSION

### 1. *Miro's Authority*

██ The district court first concluded that Miro's actual authority was limited by the terms of the agency agreement in force between Miro and Muldoon (acting in behalf of Transit), which agreement prohibited Miro from entering into agreements utilizing premium rates not on file with appropriate state regulatory authorities.[4] The agreement authorized Miro to issue policies "subject to and in accordance with the insurance laws and regulations of each State, and in accordance with rates, filings, forms, policy limits, underwriting guidelines governing acceptance * * * as directed, filed, and promulgated by [Transit] * * *." Wal–Mart argues that this language amounts merely to "instructions" to act lawfully, and that Miro was actually authorized to issue whatever policies he deemed prudent.

██ We agree with the district court that the language of the agency agreement operated to define the scope of Miro's actual authority. *See* Restatement (Second) of Agency § 33 (1958). The limitations set forth in the agreement imposed substantive boundaries upon Miro's authorized activities. Assuming, as the district court did, that Miro acted unlawfully in entering into the $3.5 million agreement, the district court correctly concluded under the facts presented that Miro acted outside of the bounds of the actual authority granted to

3. The Wal–Mart policies had been 100% reinsured through offshore captive reinsurance companies under Miro's control. Transit had made a conscious effort to expand its involvement in such offshore captive reinsurance ventures, in which Transit served merely as the "fronting" company, permitting the use of its policy forms for a percentage fee. Assuming all risks were properly reinsured with solvent companies, Transit believed it was protected from exposure on the insured risks.

4. Issues regarding the nature and extent of an agency relationship are, when material facts are undisputed, questions of law reviewable de novo. *Campbell v. Bastian,* 236 Ark. 205, 365 S.W.2d 249, 251 (1963); *Field v. Omaha Stan-*

*dard, Inc.,* 582 F.Supp. 323, 328 (E.D.Pa.1983), *aff'd,* 732 F.2d 145 (3d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984) ("If the facts concerning the connection between the parties are not in dispute, questions concerning the existence and the nature of the relationship are properly determined by the court."). *See* 3 C.J.S. *Agency* § 548, at 482 (1973); 3 *Couch on Insurance* § 26.61, at 618 (1984). The facts necessary to an analysis of the agency issues presented here were set forth in detail by the district court. Our analysis does not reevaluate these factual determinations, but simply places differing emphasis upon essentially undisputed facts when we believe they are of greater or lesser legal significance.

him by Transit pursuant to the agency agreement.

■ With regard to the issue of Miro's apparent authority, however, we disagree with the conclusion reached by the district court. Under Arkansas law, which the parties agree applies to this issue, apparent authority is such authority as "a principal proclaims or permits, such authority which a principal by lack of care causes or allows, or such authority as a reasonably prudent man using diligence and discretion would naturally suppose." *Scholtes v. Signal Delivery Serv., Inc.*, 548 F.Supp. 487, 495 (W.D.Ark.1982). *See Mack v. Scott*, 230 Ark. 510, 323 S.W.2d 929, 931–32 (1959); *Ozark Mut. Life Ass'n v. Dillard*, 169 Ark. 136, 273 S.W. 378, 381 (1925). Two elements must be established to support a showing of apparent authority: "(1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Central Surety & Ins. Corp. v. O. & S. Wholesale Co.*, 193 Ark. 523, 101 S.W.2d 167, 172 (1937) (quoting 2 C.J. *Agency* § 213, at 574). *See Continental Cas. Co. v. Erion*, 186 Ark. 1122, 57 S.W.2d 1025, 1028 (1933). If an agent acts within the scope of his apparent authority, his acts bind the principal, whether actually authorized or not, and even if contrary to express direction. *See Landmark Savings Bank v. Weaver–Bailey Contractors, Inc.*, 22 Ark.App. 258, 739 S.W.2d 166, 169 (1987).

■ Transit does not dispute that the first portion of this test, conduct by the principal, is satisfied in this case through Transit's provision of blank policy forms to Miro. The more difficult issue is whether Wal–Mart acted reasonably in believing that Miro possessed sufficient authority to enter into the $3.5 million agreement. We believe it did.

In reaching its conclusion on this issue, the district court focused primarily upon two facts: Wal–Mart's sophistication as an insurance purchaser and the very low premium offered by Miro. The court concluded that the deal offered by Miro was "too good to be true," and that Wal–Mart, as an experienced and knowledgeable insurance buyer, should have known that no reasonable insurer would permit an agent to offer a policy on such terms. There are two flaws in this approach. First, such an analysis places great weight upon events which took place subsequent to the time the contract was agreed upon. The terms offered by Miro appear extraordinarily favorable only because of Wal–Mart's loss experience over the two years following the initiation of the policy. There was testimony that workers' compensation claims filed by Wal–Mart employees over several years preceding 1982 in the states in which Wal–Mart was self-insured averaged just over $2 million per year. Projected losses for the first policy year were estimated to be under $3 million. Thus, while a $3.5 million guaranteed premium was certainly a competitive offer, it was by no means unreasonably low in comparison to Wal–Mart's demonstrated loss history at the time. The reasonableness of Wal–Mart's actions and perceptions must be judged at the time the contract was entered into, under the facts and circumstances then existing. The district court erred in relying so heavily on Wal–Mart's disastrous loss experience, something about which all the parties were unaware at the relevant point in time.

Additionally, we believe that the district court's analysis improperly imposed upon Wal–Mart an unreasonable level of expertise in state workers' compensation insurance laws and practices. The court found, and we agree, that Wal–Mart was a sophisticated insurance consumer. However, the court also found that such sophistication should have been adequate for Wal–Mart to know without question, before receipt of the actual policy from Transit, that Miro's proposal, in any form, would not have been satisfactory to state insurance regulators. An insured whose principal business is retail sales cannot be reasonably expected to

maintain such expertise in the intricacies of state workers' compensation regulatory requirements in each of the many states in which it does business. Under the district court's analysis, Wal–Mart would have been obligated to ascertain, for example, whether its insurer had utilized proper rating classifications in each state, whether those classifications had been properly applied to filed rates, and whether the insurer had properly applied filed rate deviations, if any, in each relevant state. Imputing such knowledge, and the investigatory obligations which follow, in an area as complex as workers' compensation regulatory requirements and filings to an insured even as sophisticated as Wal–Mart is not reasonable under the circumstances of this case.

Moreover, the standard applied by the district court imposes an obligation upon Wal–Mart to know when a quoted insurance premium is too low, and to reject it. Such an approach would require an insured to engage in an underwriting analysis of the risk involved to make an educated determination regarding the adequacy of the quoted premium. We believe that the duty to make this determination is better placed upon the insurer, who is undoubtedly in a better position to evaluate the relevant facts. While there may be a point at which a quoted premium is so small in light of previous loss experience that an insured should be charged with knowledge of its inadequacy, we do not believe that this case presents such a scenario.

We find, therefore, that the district court erred in its reliance upon Wal–Mart's purported knowledge of future losses, the requirements of state workers' compensation regulations, and the intricacies of premium underwriting in finding that Wal–Mart acted unreasonably in believing that Miro was within his authority in offering the $3.5 million agreement. Further, the court improperly failed to consider evidence of the circumstances which existed at the time the agreement was reached. The record reflects that at that time, the insurance industry was extremely competitive. Witnesses referred to the "soft market" for insurance products which was then in existence in which premiums were lowered to obtain preferred clients. Wal–Mart was aware that insurers were willing to reduce premiums to obtain its business.[5] Wal–Mart also knew that there existed numerous mechanisms by which filed workers' compensation rates could be legitimately adjusted to achieve a quoted premium. Devices such as premium discounts, retrospective rating, policy dividends, rate deviations and scheduled rating were available to legally reduce premium charges below what would have to be paid pursuant to filed rates.[6] We believe, at the time Miro approached Wal–Mart with his bid, that Wal–Mart could have reasonably believed that the $3.5 million premium was potentially within the bounds of state requirements. Through hindsight, we now know that the Miro bid was unreasonably low. To require Wal–Mart to have made such a determination in 1982, given the nature of the insurance market at the time and the numerous ways in which an insurer might have achieved such a rate, is improper. Miro acted within his apparent authority when he offered Wal–Mart the $3.5 million guaranteed premium, and Transit is, therefore, bound by his actions.

### 2. Legality of the Agreement

■ We must next consider whether the district court correctly found that the premium agreement violates state law. The

---

5. In addition, many states had, by this time, implemented efforts aimed at deregulating the workers' compensation insurance industry. Minnesota, for example, a state which had required adherence to rates promulgated by a state rating commission, changed its laws in 1979 to require only that workers' compensation insurers not charge more than a maximum rate. See Minn.Stat. § 79.21 (1982). Such deregulation efforts added to the growing competitive atmosphere in the industry.

6. For example, there was testimony that in 1984, Transit had filed and received approval in Arkansas for separate 15 and 50 percent deviations from filed rates. Accordingly, the actual premium charged by Transit in 1984 could have been up to 65 percent less than the actual rates filed in Arkansas. The premium which the district court ordered Wal–Mart to pay is based upon filed rates with no discounts or deviations.

district court found that there was no need to examine the laws of each individual state in which Wal–Mart did business to make this determination because the agreement violated basic principles of workers' compensation law common to each state's regulatory system. The court found that an agreement to provide workers' compensation coverage for a fixed premium, not to be adjusted for any factor other than a change in payroll, and not tied in any way to rate filings in effect in any state violated the basic statutory concept of workers' compensation, that all employers must provide a specified level of coverage for injured workers at specified and approved rates. The court also found that the agreement was contrary to anti-rebate laws in effect in each relevant state. Wal–Mart argues that both of these conclusions are in error, and that the premium agreement is, or could have been, completely legal and fully enforceable in all states.

After reviewing the record and the workers' compensation laws of the states involved,[7] we agree that the agreement is illegal and violates the law of each state, but for reasons different than those expressed by the district court. First, while it is true, as Wal–Mart contends, that there has been a marked trend away from strict regulation of the rates which workers' compensation insurers must charge, all states, including those in which insurers are free to charge whatever rates they desire (the so-called "open-rated" states), require that insurers file their rating schedules and policy forms for review by state authorities, who may reject rate proposals which would result in inadequate, excessive or discriminatory charges.[8] In addition, each state prohibits any person or organization from knowingly submitting false or misleading information to the regulatory authorities responsible for such review.[9] Regardless of the degree of control and supervision each state exercises over the specific rates workers' compensation insurers may charge, all require that these informational filings be made. We believe that the arrangement in effect in this case stands in clear violation of this statutory requirement.

There is no dispute that the manner in which the policies issued to Wal–Mart reached the agreed upon premium was by manipulation of payroll amounts. The payrolls for each state were depressed below what was actually anticipated in order to reach the $3.5 million total, with no intent by either party to adjust the payroll figures to reflect actual amounts at a later time. The district court found, and we agree, that all parties, at some time during the policy period, knew that the payroll figures had been depressed, should have taken action to resolve the misrepresentations, but did

---

7. The states within the coverage of the policies were: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas. New Mexico was listed on the first policy, but not on the renewal policy.

8. Ala.Code § 25–5–8(f)(2) (1986); Ark.Stat.Ann. § 23–67–119(1)(A) (1987); Fla.Stat.Ann. § 627.091(1) (West 1984); Ga.Code Ann. § 33–9–21(a) (1987); Ill.Stat.Ann. ch. 73 ¶ 1065.4(1) (Smith–Hurd 1988); Ind.Code Ann. § 27–7–2–13(a) (1986); Iowa Code Ann. § 515A.4(1) (West 1988); Kan.Stat.Ann. § 40–928 (1986); Ky.Rev.Stat.Ann. § 304.13–051 (Baldwin 1987); La.Rev.Stat.Ann. § 22:1407(A)(1) (West Supp.1988); Miss.Code Ann. § 83–3–107(1) (1973); Mo.Rev.Stat. § 379.321(1) (1986); Neb.Rev.Stat. § 44–1405 (Reissue 1984); N.M.Stat.Ann. § 59A–17–10 (1984); N.C.Gen.Stat. § 58–124.20 (1982); Okla. Stat.Ann. tit. 36 § 903 (West Supp.1988); S.C.

Code Ann. § 38–43–340 (Law. Co-op. 1985); Tenn.Code Ann. § 56–5–306(b) (Supp.1987); Tex.Ins.Code Ann. § 5.15(a) (Vernon 1981).

9. Ala.Code § 27–13–77 (1986); Fla.Stat.Ann. § 627.361 (West 1986); Ga.Code Ann. § 33–9–35 (1987); Ill.Stat.Ann. ch. 73 ¶ 1065.14 (Smith–Hurd 1988); Ind.Code Ann. § 27–1–22–17 (1986); Iowa Code Ann. § 515A.14 (West 1988); Kan.Stat.Ann. § 40–938 (1986); La.Rev.Stat. Ann. § 22:1416 (West Supp.1988); Miss.Code Ann. § 83–3–119 (1973); Mo.Rev.Stat. § 379.353 (1986); Neb.Rev.Stat. § 44–1436 (Reissue 1984); N.M.Stat.Ann. § 59A–17–31 (1984); Okla.Stat. Ann. tit. 36 § 935 (West Supp.1988); S.C.Code Ann. § 38–43–100 (Law. Co-op. 1985); Tex.Ins. Code Ann. § 5.21 (Vernon 1981). Arkansas, Kentucky, North Carolina and Tennessee had no comparable statute during the relevant time period. However, each state's general prohibitions against misrepresentation and fraud upon state officials would undoubtedly extend to the conduct at issue here.

nothing. As written by Miro, the policies did not embody the parties' actual agreement, which was to provide coverage for the full employee payroll for $3.5 million. As written, therefore, the policies operated to deceive state regulatory authorities, because, in actuality, they embody a rating schedule which the parties never planned to file with any state. It would be impossible for state regulators to test the policies to ascertain whether the rates charged were inadequate, excessive or discriminatory, because the policies on their face did not reveal the true rates being charged. While the policies theoretically could have been structured to meet the $3.5 million bottom line through the use of legitimate discounting procedures, such legitimate procedures were not utilized here. The policies materially misrepresented information required by law to be reported truthfully in every state. They were deceptive as written, and thus violate the laws of each state involved.

### 3. Effect of Illegality

The district court found that the insurance policies were enforceable pursuant to the terms appearing on their face, computed according to Wal–Mart's actual payroll. Accordingly, the court ordered Wal–Mart to pay Transit additional premiums in an amount equal to what would have been due under the policy had actual payroll figures been utilized. The court said that whether the agreement regarding premium was illegal or not, workers' compensation law requires that the coverage terms of the policies be enforced as written.

■ We find such a result inappropriate given our conclusion that the agreement is illegal in its entirety. In its analysis, the district court separated the insurance agreement into two parts, a premium portion and a coverage portion, and enforced one segment but not the other. In reality, there was but one contract in effect between Transit and Wal–Mart, renewed after the first year, which contract consisted of premium and coverage terms, both of which were essential to a complete and binding agreement. See, e.g., Hanna v. Johnson, 233 Ark. 409, 344 S.W.2d 846, 851

(1961) (enforceable contract requires meeting of the minds as to all material terms). As clearly found by the district court, Transit agreed to provide workers' compensation benefits to Wal–Mart employees for a premium of $3.5 million. If the premium term of the contract is illegal and unenforceable, as we believe it is, the coverage portion of the same contract is necessarily unenforceable as well. The district court's resolution of this matter requires the execution of contractual terms to which there was no agreement by any party to the negotiations. Such a resolution is inappropriate under these circumstances. See Borden, Inc. v. Smith, 252 Ark. 295, 478 S.W.2d 744, 747 (1972) (court should not vary the terms of an agreement between the parties; to do so would "mean that we were making a new contract and we have consistently held that this will not be done.").

We find that a more fitting resolution to this dispute is to apply the doctrine of in pari delicto, and leave the parties as they presently stand. Arkansas has recognized and applied the doctrine of in pari delicto when parties to an illegal contract are equally culpable. "The general rule with respect to illegal contracts is that neither courts of law nor of equity will interpose to grant relief to the parties, if they have been equally cognizant of the illegality." City Nat'l Bank v. First Nat'l Bank and Trust Co., 22 Ark.App. 5, 732 S.W.2d 489, 495–96 (1987). See Long v. Mabry, 250 Ark. 947, 470 S.W.2d 319, 321 (1971) (where parties to illegal bargains are in pari delicto, the law will "leave them where it finds them."); Womack v. Maner, 277 Ark. 786, 301 S.W.2d 438, 439 (1957). If the court finds that the parties are equally at fault in perpetrating the illegal transaction, relief will be unavailable to either party to the transaction. Id. See also Williams v. Wilson, 181 F.Supp. 351, 354 (E.D.Ark. 1960). As noted by the district court, the principal purpose of the rule is to discourage the making of illegal agreements. See generally 17 Am.Jur.2d Contracts § 216, at 585–86 (1964) ("The rationale of the rule rests upon the broad ground that no court will allow itself to be used where its judg-

ment will consummate an act forbidden by law, and upon the policy of discouraging illegal and corrupt agreements by refusing all judicial aid to the parties thereto."). The rule applies with equal force where the contract has been executed in whole or in part. *Id.* at § 223.

■ The level of culpability of the parties was best put, we think, by the district court when it said, "there is more than enough fault to go around in this case." *Wal–Mart*, 664 F.Supp. at 1269. The district court's opinion explains in detail the various activities of Transit, through its agent Miro, and of Wal–Mart, by which each was or became an active participant in carrying out the illegal portions of the insurance contract. Transit is charged with responsibility for the acts of its agent, Miro, who structured the deal from the start. Wal–Mart, as the district court found, became aware of the depressed premium figures, and did nothing. Though Wal–Mart acted reasonably in its belief at the outset that Miro could have lawfully structured the policies to reach the quoted premium, when the policies were later delivered and Wal–Mart became aware of the manner in which the quoted premium was actually achieved, the reduction of payroll, Wal–Mart should have taken corrective action. It is at this point, when Wal–Mart saw how Miro structured the policies, that Wal–Mart became chargeable with the illegality.[10] We believe the district court

correctly concluded that all parties were active and willing participants in a knowingly illegal venture.[11]

■ Accordingly, we find that the district court should have found the parties in pari delicto and refused to grant relief of any sort. The district court discussed the issue, but found that application of the doctrine was inappropriate because Wal–Mart would supposedly receive the full benefit of its illegal activities, thereby encouraging rather than deterring the formation of illegal bargains. We disagree. The district court's analysis places undue emphasis on the fact that the agreement has been partially executed, a fact which, as noted, is not pertinent to the application of the in pari delicto doctrine. In any event, we believe, to the contrary, that application of the doctrine here would work to discourage insurers from permitting agents to quote premiums and structure policies in violation of state insurance regulations. Requiring the payment of greater premiums by Wal–Mart not only stands in direct conflict with the terms of the original agreement as all parties expected it to be carried out, but operates to reward Transit for structuring an illegal arrangement which it, as the insurer, was in the best position to prevent. The district court should have denied relief on both Wal–Mart's action for a declaratory judgment and Transit's counterclaim for payment of premiums.

10. The district court also placed great weight upon an incident which we agree demonstrates Wal–Mart's cognizance of and willingness to participate in the illegal arrangement after delivery of the policies. In late 1984, Miro told Wal–Mart and A & A that a transfer of $6 million needed to be made to "satisfy statutory requirements." Miro acknowledged, according to their agreement, that Wal–Mart did not owe additional premiums, but suggested that Wal–Mart transfer the money to Miro, who would transfer it to his offshore captive reinsurance company, who would then transfer it back to Wal–Mart as a dividend. Wal–Mart, without inquiring about the specific regulatory requirements which were involved or questioning why such a sham payment had to be made, agreed to the transfer with assurances that the funds would be returned. We agree with the district court that Wal–Mart's willingness to participate in this transaction, though it was never consummated, speaks loudly about its knowledge of the

propriety of the entire arrangement. For a more detailed description of the proposed transaction, see *Wal–Mart*, 664 F.Supp. at 1250–51 & 1260–61.

11. An additional issue raised by the parties, but not considered by the district court, involves whether Transit's receiver is bound by the illegal acts of the insolvent prior to receivership. Transit relies upon a line of cases following *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), in which the Supreme Court held that the FDIC is not bound by undisclosed arrangements affecting the genuineness or integrity of notes in the insolvent bank's portfolio. Transit asks that we apply a similar doctrine to it as the receiver of an insolvent insurer. Transit cites no cases extending the *D'Oench* doctrine beyond the confines of the banking industry, and we are not persuaded to take such a step here.

■ One further comment on the practical effect of such a resolution of this case is necessary. As noted, while Transit has paid somewhere between $16 and $21 million in claims on the two workers' compensation policies, the parties expect that a significant amount of claims are yet to be filed and paid. The ultimate responsibility for payment of these claims, in the absence of valid workers' compensation insurance coverage, rests with Wal–Mart as the employer. *See New Hampshire Ins. Co. v. Logan,* 13 Ark.App. 116, 680 S.W.2d 720, 722 (1984) ("[T]he primary liability for workers' compensation is upon the employer and * * * insurance coverage does not relieve the employer of that liability."); *McGehee Hatchery Co. v. Gunter,* 234 Ark. 113, 350 S.W.2d 608, 611 (1961). As a leading commentator explained:

> While as between the insurer and employer, the former is liable to pay such awards, and the employer may recover back from the insurer payments he has made, nevertheless the· employer is primarily liable and on failure of the company to pay any award, the employer will be obligated therefor. Thus, if the insurer becomes insolvent, the employer must discharge any award made, or any other sums due the employee.

7B Appleman, *Insurance Law and Practice* § 4624, at 213–14 (1979). Thus, assuming that Transit does not pay further claims, either because of insolvency or because the insurance agreement is unenforceable against it, the responsibility for payment of these claims rests with Wal–Mart.[12] We simply note that under our resolution of this case, there is no risk that injured employees will be left uncompensated.

**12.** One other potential source of funds to pay claims made by Wal–Mart employees is state insurance guaranty funds, established to assist in payment of claims against insolvent insurers. However, such funds, in general, apply only to "covered claims," a term generally defined to include only those claims within the coverage of a valid policy of insurance in effect at the time of the insolvency. 19A Appleman, *Insurance Law and Practice* § 10801, at 367–68 (1982). *See, e.g.,* Fla.Stat.Ann. § 631.54(3) (1984); Ill. Stat.Ann. ch. 73 ¶ 1065.84–3 (Smith–Hurd Supp.

## CONCLUSION

The district court placed the primary responsibility for compliance with state workers' compensation laws upon the insured, Wal–Mart. Given all the circumstances of this case, we believe this obligation more appropriately rests with the insurer, Transit. We reverse the decision of the district court with respect to Transit's counterclaim, and remand with directions to dismiss the case without relief to any party.[13]

1988); Mo.Rev.Stat. § 375.785(3)(2) (1986); Neb.Rev.Stat. § 44–2406 (Reissue 1984); N.C. Gen.Stat. § 58–155.45(4) (Supp.1987).

**13.** Given our resolution of the claims between Wal–Mart and Transit, we need not consider the district court's resolution of Wal–Mart's third-party action against A & A. It, of course, shall be dismissed along with the other claims in the lawsuit.